DAUGHTERS OF MIRIAM CENTER FOR THE AGED, a Non-Profit Corporation of the State of New Jersey, Appellant,

v.

David MATHEWS, Secretary of Health, Education and Welfare, and Blue Cross Association/Hospital Service Plan of New Jersey.

No. 78–1050.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1978.

Decided Dec. 29, 1978.

Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Borge Varmer, Regional Atty., Steven Edward Obus, Asst. Regional Atty., Dept. of Health, Education and Welfare, New York City, for appellees.

David Waldman, Rosenberg & Waldman, Hawthorne, N. J., for appellant.

Before SEITZ, Chief Judge, and ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

When Congress establishes a program to aid a particular segment of the population, it often perceives a need and envisions a goal, but as a practical matter cannot sketch the intricate details for implementing its plan. In such cases, the task of administration is frequently delegated to an agency, which is directed to develop necessary rules in light of experience. To ensure the fullest possible attainment of the legislative directives, the agency occasionally must modify its regulations to meet changing circumstances. These curative measures usually are treated deferentially by the courts, even when they upset the expectations of private parties. But sometimes, and particularly when a modification is applied retroactively, a corrective rule is found to sweep too broadly, abridging statutory authorization, exceeding the scope of a controlling rule, or even violating constitutional rights.

On this appeal, we must determine whether a curative change in the portion of the Medicare regulations dealing with nursing homes is to be applied retroactively in the factual situation presented here. Nursing homes that provide services to Medicare beneficiaries are reimbursed for their "reasonable cost" in providing such services, including the expense of acquiring their capital assets, as prorated over the useful lives of such assets. Initially, the governing regulations permitted nursing homes to prorate the expense of their assets under either straight-line or accelerated methods of depreciation. To eliminate certain abuses, however, the regulations were amended in 1970 to require that the government recapture from any provider that abandons the program or that experiences a substantial decrease in utilization by Medicare patients the excess reimbursement that resulted from the provider having depreciated its assets under an accelerated rather than the straight-line method. By administrative fiat, such amendment was given retroactive as well a prospective effect.

Daughters of Miriam Center for the Aged (the Center) experienced a substantial decrease in utilization by Medicare patients within the meaning of the new regulation during 1973, so the Secretary of Health, Education and Welfare (Secretary), who supervises the Medicare program, ordered the recapture from it of $148,324—the difference between accelerated and straight-line

depreciation for the previous six years. The Center challenged, on statutory and constitutional grounds, the application to it of the depreciation recapture regulation, but was denied relief in the district court. Because we disagree with HEW's position that retroactive application to the Center of such regulation so as to permit recovery of excess reimbursements for years prior to 1970 is consistent with the purpose underlying such regulation, that portion of the judgment that is based upon retroactive application of the recapture regulation will be reversed.

## I.

Under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, hospitals, nursing homes, and similar-type facilities that are providers of services to Medicare patients generally may not charge such patients directly for the services provided. 42 U.S.C. § 1395cc(a)(1). Instead, the Secretary of HEW, usually through designated fiscal intermediaries, reimburses each provider for the "reasonable cost" incurred by it in rendering such care. 42 U.S.C. §§ 1395(f)(b), 1395h. The provider is reimbursed periodically, though not less often than monthly, for its estimated expenses, based on billings submitted to the Secretary or his designated fiscal intermediary. At the close of the fiscal year, the provider submits a cost report, and the Secretary then determines by audit the amount of reimbursement to which the provider is entitled for that period. Adjustments are thereafter made in the current periodic payments so that the actual reimbursement for the year coincides with the amount due under the audit. 42 U.S.C. § 1395g.

Recognizing that health facilities use a variety of methods to determine patient charges and the expenses of rendering care, Congress refrained from specifying the method to be used for calculating "reasonable cost." Rather, in 42 U.S.C. § 1395x(v)(1)(A),[1] Congress delegated to the Secretary of HEW the responsibility for promulgating regulations that establish the methods to be adopted and the items to be included in the determination of "reasonable cost." Although the Secretary is given considerable leeway in fashioning the regulations, he is instructed that "reasonable cost" is to reflect the cost "actually incurred" in supplying the services, so that the cost of delivering services to Medicare patients will not be imposed on the provider's other patients, and the cost of caring for non-Medicare patients will not be borne by the Medicare program. The section also states that the regulations are to

> provide for the making of suitable retroactive corrective adjustments where, for a provider of services of any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

In a more general vein, Congress declared in 42 U.S.C. § 1395hh that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."

Exercising the authority vested in him, the Secretary published regulations defining and governing the methods and formu-

---

1. 42 U.S.C. § 1395x(v)(1)(A) provides, in pertinent part:

 The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services . . . .. Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this [title] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

las for determining "reasonable cost." Initially, the regulations permitted providers to include as a "reasonable cost" item the depreciation of their capital assets as computed either under the straight-line method or under one of two accelerated depreciation methods.[2] Experience soon showed, however, that use of an accelerated method results in excessive payments to some providers. Therefore, on February 5, 1970, a proposed regulation was promulgated and then published in the Federal Register, 35 Fed.Reg. 2593, becoming effective on August 1, 1970, as 20 C.F.R. § 405.415. Under the new rule, nursing homes certified as Medicare providers after August 1, 1970, were not permitted to use an accelerated method, and presently certified homes were not allowed to use such method for any newly acquired assets. Providers were authorized to continue to depreciate on an accelerated basis those assets for which such method was already being used. But, if a provider terminated its participation in the program, or if the Medicare proportion of its allowable costs decreased substantially, the Secretary was now able to recover the amount by which the reimbursable cost that had been determined by using an accel-

erated depreciation method and paid to the provider exceeds the reimbursable cost which would have been determined and paid to it by using the straight-line method of depreciation. Such amount could be recouped as an offset to current reimbursement due the provider, or, if the home has left the program, as an overpayment.[3]

■ Subsequently, in May, 1972, the Provider Reimbursement Manual, which interprets and elaborates upon the Medicare regulations, was revised in a number of important respects. First, it announced that the new regulation regarding the recapture of accelerated depreciation would be applied retroactively to recover excess reimbursements received by providers during fiscal periods prior to 1970, the year of the new enactment. Second, the Manual made the recapture provision inapplicable to those providers that severed their relationship with the Medicare program effective before August 1, 1970. Third, the Manual explained that for purposes of the recapture rule, a substantial decrease in Medicare utilization occurs "where the provider's ratio of health insurance days to total in-patient

2. 20 C.F.R. § 405.415 (1967). Straight-line depreciation requires an even allocation of the cost of a capital asset, less its salvage value, over its useful life. Accelerated depreciation allocates more of the cost of a capital asset to the early years of the asset's useful life, and less to its later years. Declining balance and sum-of-the-years' digits methods of accelerated depreciation were acceptable under the original regulation.

The different rates of depreciation may be illustrated through an example: Provider purchases, in 1967, a bed for use by Medicare patients at a cost of $1,000. The bed has an expected useful life of 10 years, at the end of which it will have an estimated salvage value of $100. The provider may allocate its cost among the next 10 years as follows:

| Year | Straight-Line | Double Declining Balance | Sum-of-the-years' digits |
|------|---------------|--------------------------|--------------------------|
| 1967 | $90 | $200 | $164 |
| 1968 | 90 | 160 | 147 |
| 1969 | 90 | 128 | 135 |
| 1970 | 90 | 102 | 110 |
| 1971 | 90 | 82 | 98 |
| 1972 | 90 | 66 | 82 |
| 1973 | 90 | 52 | 66 |
| 1974 | 90 | 42 | 49 |

| Year | Straight-Line | Double Declining Balance | Sum-of-the-years' digits |
|------|---------------|--------------------------|--------------------------|
| 1975 | $90 | $ 34 | $ 33 |
| 1976 | 90 | 27 | 16 |

[figures rounded off to nearest dollar]

3. Of particular relevance to this case is 20 C.F.R. § 405.415(d)(3), which reads:

When a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health insurance proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost, determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program by using the straight-line method of depreciation will be recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recognition will be given to the effects the adjustment to straight-line depreciation would have on the return on equi-

days . . . has decreased 25 per cent or more from the base period to the computation period." [4] Because the Manual provisions enunciate HEW guidelines and policies for implementing the Medicare regulations but are not issued in accordance with the procedures specified in the Administrative Procedure Act,[5] they perforce must be considered interpretative rules.[6]

## II.

The Center is a non-profit organization that owns and operates a skilled nursing facility in Clifton, New Jersey. Of the 244 beds that it maintains, 30 have been certified for use by Medicare patients. From the time it qualified as a provider in 1967, the Center has depreciated its capital assets on an accelerated basis. On November 17, 1975, the Hospital Service Plan of New Jersey, acting as HEW's fiscal intermediary,[7] notified the Center that an assessment

would be made against it to recover $148,-324.00. The assessment was based on a determination that the Center had a 47.36 per cent decrease in Medicare utilization between the base period, consisting of the years 1971 and 1972, and the computation period of 1973,[8] and represented the amount that could be recouped under the depreciation recapture regulation for the years 1967 through 1972.

A hearing before the Provider Reimbursement Review Board was requested by the Center, and was held on August 4, 1976. Noting that the regulation itself did not require retroactive recapture of accelerated depreciation, the Board expressed doubts whether the Manual's instruction that the provision be applied retroactively was valid inasmuch as it had not been promulgated in accordance with the rulemaking procedures of the Administrative Procedures Act.[9]

ty capital and on the allowance in lieu of specific recognition of other costs in the respective years.

4. Section 136.4 of the Provider Reimbursement Manual (HIM–15), captioned, "Decrease in Health Insurance Proportion of Allowable Costs," states in part:

B. *Amount of Decrease.*—A recovery of amounts paid in excess of straight-line depreciation is made where the provider's ratio of health insurance days to total inpatient days (certified areas only) has decreased 25 percent or more from the base period to the computation period. No recovery will be made, however, unless there has been a decrease of 25 percent or more in the overall average of HI [Health Insurance] days in the base period and the HI days in the computation period. In addition, a recovery of amounts paid in excess of straight-line depreciation due to a decrease in HI utilization is not made where the cumulative total of HI days in the base period is less than 5 percent of the cumulative total of inpatient days in the facility (certified areas only).

5. The Forward to the Manual describes its function as follows:

This manual provides guidelines and policies to implement Medicare regulations. . . . The provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations. . . The manual accommodates new pages or revisions as further interpretations of the regulations and changes in procedures and methods are made. Accordingly, revised sections, pages, or chapters are issued as necessary.

6. *See* note 9 *infra.*

7. The responsibilities of fiscal intermediary were subcontracted to Hospital Service Plan of New Jersey by Blue Cross Association, which held a contract to act as HEW's fiscal intermediary.

8. Utilization of the Center's facilities during the periods ending December 31, 1971, 1972, and 1973 were as follows:

| Year Ending | Total Inpatient Days | Total Medicare Days |
|---|---|---|
| December 31, 1971 | 10,230 | 3,412 |
| December 31, 1972 | 10,472 | 3,066 |
| December 31, 1973 | 10,410 | 1,715 |

Cumulatively, for the periods ending 1971 and 1972, the Center experienced a Medicare utilization of 31.29 percent. In 1973, the home's Medicare utilization dropped to 16.47 percent. Thus, the Center's Medicare utilization dropped 47.36 percent between the base period of 1971–72 and the computation period of 1973.

9. The Board questioned whether the Manual provision constituted legislative rulemaking by HEW that did not comply with the procedures set forth in the Administrative Procedure Act, 5 U.S.C. § 553, or whether it was merely interpretative of the new regulation and was therefore not within the compass of that Act. We note that one respected commentator has stated that the agency's intent when issuing the rule should govern as to whether such rule is legislative or interpretative. Such intent is often to be determined from whether the agency followed the rulemaking procedures laid down

The Board then found that, as the Center had contended, the decrease in Medicare utilization was no fault of the Center, but rather was caused by a June 1971 revision of HEW regulations that imposed stricter eligibility requirements for individuals seeking to qualify for Medicare coverage. Viewing the provision that changed the requirements for Medicare eligibility together with the provision authorizing the recapture of accelerated depreciation, the Board concluded that "the result penalizes a provider for its decrease in Medicare utilization as if such decrease had been voluntary."[10] It held that the regulation regarding the recapture of accelerated depreciation should be applied only prospectively, and refused to allow the fiscal intermediary to recapture accelerated depreciation for periods ending on or before December 31, 1969.

The Commissioner of Social Security examined the Review Board's decision on his own motion,[11] and revised that part of the decision that disallowed the recapture of accelerated depreciation for fiscal periods ending prior to January 1, 1970. The Center then filed suit in the District Court for the District of New Jersey, alleging that retroactive application of the depreciation recapture regulation (1) exceeds statutory authorization and (2) is unconstitutional.

On November 3, 1977, the district court granted summary judgment in favor of the defendants, thus sustaining the decision of the Commissioner. The trial judge interpreted 42 U.S.C. § 1395x(v)(1)(A)(ii), which directs that the regulations shall "provide for the making of suitable retroactive corrective adjustments," as authorizing retroactive application of regulations such as the one in question. He also upheld the regulation and its retroactive application against constitutional attack, concluding

that it is " 'reasonably related to the purposes of the enabling legislation' "[12] because it ensures that the cost of providing services to non-Medicare patients will not be borne by the Medicare program. The Center's arguments. that consideration be given to the fact that the Center is a non-profit organization and that since it is continuing in the program the accelerated and straight-line methods of depreciation would eventually even out were deemed unpersuasive by the district court.

A timely appeal to this Court was filed by the Center, challenging (1) the statutory authorization for, and (2) the constitutionality of, the retroactive application of the recapture regulation.

### III.

Our approach to the problems raised in this appeal differs to some degree from the position urged upon us by each of the litigants. It is evident that statutory authorization would exist for a depreciation recapture regulation that, by its terms, is to apply retroactively. Such authorization may be inferred from § 1395hh, which states that, "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." See Adams Nursing Home of Williamstown, Inc. v. Mathews, 548 F.2d 1077, 1082 (1st Cir. 1977). However, 20 C.F.R. § 405.415 itself is silent as to whether excess depreciation is to be recaptured for years prior to 1970, the year in which that regulation was promulgated. Instead, retroactive application of the regulation was decreed in a provision of the Provider Reimbursement Manual that was issued as an expression of the guidelines and policies that HEW was

---

in the Act or chose instead to issue the rule as an explanation of the agency's position regarding a matter within its purview. .K. C. Davis, Administrative Law of the Seventies § 5.03 at 148 (1976). Accordingly, since HEW appears to have considered the Manual provision to be interpretative, see note 5 supra, we treat it as such.

**10.** Appendix 6a.

**11.** Review was undertaken pursuant to 42 U.S.C. § 1395oo (f).

**12.** Citing Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), quoting Thorpe v. Housing Authority, 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

adopting to implement such regulation. The initial issue before us, then, is whether retroactive application to the Center of the depreciation recapture regulation is consistent with the purpose and design of that regulation.

Counsel for the defendants, as well as the dissent, insist that the Center must bear the burden of proving that such retroactive application is arbitrary and irrational. Such standard is said to be required by *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), where the Supreme Court, in upholding the Black Lung Benefits Act of 1972, 30 U.S.C. § 901 *et seq.*, against a due process challenge to the statute's retroactive impact, stated:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.[13]

In our view, it would be improper to invest the administrative agency's retroactive modification at issue in the present case with a similar presumption of constitutionality. It is now well accepted that "courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws,"[14] and that " '[f]or protection against abuses by legislatures the people must re-sort to the polls, not to the courts.' "[15] The constitutional legitimacy that inheres in Congress by virtue of its accountability to the electorate is absent, however, from the administrative process, and consequently, serious questions are continually being raised—and with increased frequency—regarding the legitimacy of the administrative apparatus within the framework of American government.[16] Near the center of the growing concern over legitimacy lies the apprehension that the critical choices of our society will more and more be made by administrative personnel who ofttime are not, as a practical matter, accountable to anyone and whose decisions are immune from challenge.

It is, of course, open to speculation what repercussions such questioning may eventually have upon the standards that guide judicial review of various types of administrative promulgations.[17] For instance, to date courts generally have considered themselves bound by legislative rulemaking—rules promulgated pursuant to congressional delegation and in compliance with the procedural requirements of the Administrative Procedure Act—and have said they would overturn such rules only when they are not " 'reasonably related to the purposes of the enabling legislation.' "[18] Such an accommodating standard of review has been justified on the ground that "[w]hen Congress has delegated to an agency the authority to make rules having [the] force

---

**13.** 428 U.S. at 15, 96 S.Ct. at 2892.

**14.** *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

**15.** *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), *quoting Munn v. Illinois*, 94 U.S. 113, 134, 24 L.Ed. 77 (1876).

**16.** For a treatment of the problem of the legitimacy of administrative agencies, *see generally*, J. O. Freedman, *Crisis and Legitimacy: The Administrative Process and American Government* (1978); K. C. Davis, *Discretionary Justice: A Preliminary Inquiry* (1969); Stewart, *The Reformation of American Administrative Law*, 88 Harv.L.Rev. 1667 (1975). A thoughtful discussion and evaluation of recent proposals for review of congressional delegations to administrative agencies is provided by Judge McGowan in *Congress, Court and Control of Delegated Power*, 77 Colum.L.Rev. 1119 (1977).

**17.** Cf. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).

**18.** *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (5 U.S.C. § 706(2)(A) "requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' . . . [T]he ultimate standard of review is a narrow one.")

of law and the agency uses the proper procedure to act reasonably and within the delegated power, the reviewing court has no more power to substitute [its] judgment for that of the reviewing agency than it has to substitute [its] judgment for that of Congress in determining the content of a statute." [19] Nonetheless, it appears that in recent years legislative rulemaking has been subjected to a more intensive level of judicial review than the reasonableness standard would suggest.[20]

■ For the purpose of this appeal, however, we need not anticipate future developments, since retroactive application to the Center of the depreciation recapture regulation was mandated solely by an interpretative rule found in the Provider Reimbursement Manual. Interpretative rulemaking—those statements made by an agency to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulation —"[is] not controlling upon the courts" [21] inasmuch as they are not promulgated pursuant to a delegation by Congress of authority to legislate. Instead, courts remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented. Describing the attitude with which courts regard interpretative rules, Justice Jackson commented in a famous passage that

> rulings, interpretations and opinions of the [responsible agency] . . ., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.[22]

■ In exercising our independent judgment whether the depreciation recapture regulation should be applied retroactively to the Center, as the Manual directs, we search in vain for a statement of the reasons that prompted the adoption of such an approach.[23] Moreover, the position tak-

19. K. C. Davis, Administrative Law of the Seventies § 29.01–1 at 205–06 (Cumulative Supplement 1977).

20. *See, e. g., Tanners' Council of America, Inc. v. Train*, 540 F.2d 1188 (4th Cir. 1976); *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620 (2d Cir. 1976); *National Welfare Rights Organization v. Mathews*, 174 U.S.App.D.C. 410, 533 F.2d 637 (1976); *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968). *See generally*, K. C. Davis, *supra* note 19, at § 29.01–2.

21. *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 674, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), *quoting Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

22. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *See also General Electric Co. v. Gilbert*, 429 U.S. 125, 140–145, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). *See generally*, K. C. Davis, *supra* note 19 at 29.01–1.

23. We do not regard § 1395x(v)(1)(A)(ii), which is quoted in footnote 1 *supra*, as a specific direction to the Secretary of HEW to promulgate regulations that give retroactive effect to every change that is made in the methods and formulas for determining reasonable cost. Rather, that section appears to be an explicit instruction to the Secretary to promulgate regulations that mandate retroactive adjustments in the *payments* received by providers, so as to bring the amounts paid to them on the basis of their monthly estimates in line with the amount actually due them under the annual audit. In so instructing the Secretary, the section is designed to ensure the promulgation of regulations that would implement the scheme envisioned in § 1395g.

We recognize that our interpretation of § 1395x(v)(1)(A)(ii) is contrary to the construction given to it in *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663 (2d Cir. 1973), and followed without further analysis by other courts. *See Summit Nursing Home, Inc. v. United States*, 572 F.2d 737 (Ct.Cl. 1978); *Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977); *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d 703 (9th Cir. 1976), *vacated and remanded on other grounds*, 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977); *Kingsbrook Jewish Medical Center v. Richardson*, 486 F.2d 663 (2d Cir. 1973). However, *Kingsbrook* was a unique case. As does this case,

en by HEW in its Manual conflicts with the tenor of an earlier remark by the Commissioner of Social Security to the effect that it would be unfair to providers were HEW to make retroactive changes in the principles upon which "reasonable cost" is computed.[24] Finally, we note that the administrative agency here has no particular expertise concerning the issue of retroactivity. To the contrary, the extent to which retroactive effect may be given to a promulgation is governed by principles of law that have been developed and refined by the courts, primarily in the context of constitutional adjudication. Accordingly, we now examine such principles to determine whether the depreciation recapture regulation should be given retroactive effect in the present case. Because we shall conclude that retroactive application to the Center of the depreciation recapture regulation is incompatible with such principles, we shall exercise the prerogative that we have when reviewing interpretative rules and refrain in the present case from giving the regulation the retroactive effect contemplated by the manual provision.

 Retroactive measures—whether promulgated by a legislature or by an administrative agency—have traditionally been subjected to stricter scrutiny than have prospective measures.[25] Thus, as al-

---

most cases subsequent to *Kingsbrook* involved challenges to retroactively applicable regulations that were unfavorable to the provider and, and the court in each case could have relied upon the general authorization of § 1395hh for its holding that the retroactively applicable regulation was statutorily authorized. *Kingsbrook*, in contrast, concerned the unusual situation of a provider that was seeking to compel the Secretary to apply retroactively a modification that benefited the provider, and therefore the court was forced to confront the issue whether any statutory provision *required* the Secretary to do so. In seizing upon § 1395x(v)(1)(A)(ii) to help the provider, the court in *Kingsbrook* rejected HEW's interpretation of that provision with the comment that, "[a]lthough we have uncovered no legislative history to elucidate this statutory language, its plain words do not require interpretative gymnastics." The court proceeded to infer from the language of sections 1395g and 1395x a "descriptive duality" between "methods of payment and methods of determining costs," and to assert that "[t]he regulations implementing these two sections follow this dichotomous statutory treatment." 486 F.2d at 669–70.

After examining various provisions throughout the Medicare statute with an eye toward the linguistic style employed, we remain unconvinced that Congress intentionally adopted different terminology in sections §§ 1395g and 1395x for the purpose of establishing the "descriptive duality" that the court in *Kingsbrook* infers from such usage. Nor do the regulations cited by that court reflect such "dichotomous statutory treatment." Most compelling to us, however, is a piece of legislative history that was not considered by the court in *Kingsbrook*. At one point, the Senate Committee on Finance considered a proposal that would have given providers an additional two percent above their allowable cost, to compensate for inaccuracies in the formulas used to determine reasonable cost. The following colloquy took place be-

tween Senator Anderson and Robert M. Ball, the Commissioner of Social Security:

Mr. Ball: We truly believe that the failure to allow the two percent would actually mean that we were paying less than cost for these services.

Senator Anderson: What does the law require?

Mr. Ball: That we pay cost.

Senator Anderson: If you find out you haven't paid cost, you have to pay it then. Why don't you find out about it?

Mr. Ball: I don't think that the retroactive provision contemplates going back over the year and changing the principles. I think what is contemplated is that you pay first on the basis of advances, that is estimates—not advances—on estimate.

Senator Anderson: No, 'advance' is all right. I follow you.

Mr. Ball: We have changed that. That is not an advance. But you make an estimate at the beginning of the year based on these principles. Then at the end of the year you settle up, on the basis of the principles put out.

It would hardly seem reasonable at the end of the year, after hospitals had entered into an agreement with you on the basis of certain principles, to shift all the principles for retroactive settlement in terms of how you compute a cost. I don't think that was contemplated at all.

Reimbursement Guidelines for Medicare, Hearings before the Senate Committee on Finance, 89th Cong.2nd Sess., 119 (1966).

24. *See* note 23 *supra*.

25. *See, e. g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976) ("It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. The ret-

ready mentioned, the validity of a prospective regulation by an administrative agency "will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'"[26] In contrast, "courts have generally compared the public interest in the retroactive rule with the private interests that are overturned by it" in deciding whether to uphold a retroactive promulgation.[27] Such disparate treatment is justified because retroactive laws interfere with the legally-induced and settled expectations of private parties to a greater extent than do prospective enactments. Still, retroactive rules designed to cure defects in regulatory schemes, such as the Medicare program, are often sustained because the "interest in the retroactive curing of such a defect in the administration of government outweighs the individual's interest in benefiting from the defect."[28]

The regulation permitting recapture of accelerated depreciation has been termed a curative measure, promulgated to correct an error or defect in the previous regulation.[29] Specifically, the Secretary perceived that the regulation as it originally stood facilitated abuse of the Medicare program by some providers. That regulation permitted a nursing home to choose between accelerated and straight-line methods for depreciating its assets. Although eventually, over the entire useful life of the asset, both methods would yield full reimbursement of

cost to the provider, the amount received in any given year would vary in accordance with the method chosen. Under the straight-line method, a nursing home would recoup the identical sum during each year of the asset's useful life, while under either of the two accelerated methods it would recover as an item of cost a greater amount during earlier years than during later years.[30] Thus, if a provider cared for the same number of Medicare patients each year, under the straight-line method of depreciation, the cost of the asset attributable to each patient would be allocated evenly among the patients and recovered by the provider as it rendered the services. On the other hand, under an accelerated method of depreciation, part of the cost of caring for patients in later years would be charged to the Medicare program during the earlier years, even before the provider encountered those expenses.

Affording nursing homes the opportunity to depreciate their assets on an accelerated basis was considered necessary to encourage them to participate in the Medicare program. However, it also created a loophole, and permitted some providers to obtain undeserved windfalls. Such providers would opt to depreciate their assets on an accelerated basis, recovering from the program as a reimbursement for their costs amounts that they had not yet earned. But instead of remaining in the program and providing

rospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.")

26. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), *quoting Thorpe v. Housing Authority*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969).

27. *Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077, 1080 (1st Cir. 1977). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947):
[S]uch retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the

type of retroactivity which is condemned by law.
Although the language used by the Supreme Court to describe its approach to retroactive enactments has varied from case to case, the commentators have concluded that the common thread underlying the decisions has been the balancing of considerations on both sides of the issue. *See* Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv.L.Rev. 692 (1960); Slawson, *Constitutional and Legislative Considerations in Retroactive Lawmaking*, 48 Calif.L.Rev. 216 (1960).

28. Hochman, *supra* note 27, at 705–06.

29. *See, e. g., Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 956 (5th Cir. 1977).

30. *See* note 2 *supra*.

the care for which they had already been partially reimbursed, they would quit, pocketing more than their "reasonable cost," and, in effect, reducing their overhead costs of caring for private patients. Such a state of affairs could not be countenanced in view of the explicit statutory directive that the regulations shall ensure that "the costs with respect to individuals not so covered [by Medicare] will not be borne by [Medicare] . . . ."[31] Accordingly, the Secretary promulgated 20 C.F.R. § 405.415(d)(3) in 1970, which authorized recapture of accelerated depreciation from providers that terminate their participation in the Medicare program or that experience a substantial decrease in Medicare utilization.

█ Prospective application of this curative measure must, of course, be sustained, because it is "reasonably related to the purposes of the enabling legislation." And with respect to such prospective application, the definition of substantial decrease in utilization that is offered in the Provider Reimbursement Manual reflects the considered judgment of the agency that was charged with administering the Medicare program and therefore, in the absence of any reason for being disregarded, commands judicial deference.

Similarly, *retroactive* application of § 405.415(d)(3) so as to recapture pre-1970 accelerated depreciation from providers that *terminate* their participation in the Medicare program after August 1, 1970—as is authorized by the Provider Reimbursement Manual—is reasonable, and accordingly has been upheld by those courts of appeals that have passed on the question of its validity. See *Adams Nursing Home, Inc. v. Mathews*, 548 F.2d 1077 (1st Cir. 1977); *Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977); *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d 703 (9th Cir. 1976), *vacated and remanded on other grounds*, 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801

(1977). These tribunals have wisely concluded that the public interest in recouping overpayments from homes that have left the Medicare program outweighs whatever disappointment has been caused to them. "When providers joined the program, they knew that 'small repairs' in the regulatory scheme were likely;"[32] indeed, the statute warned that they would be reimbursed only for "reasonable cost" and that retroactive adjustments might be necessary to ensure that no overpayments were made. Where a provider that had depreciated on an accelerated basis voluntarily leaves the program and will not in the foreseeable future care for any additional Medicare patients, it has undeniably been overpaid for its services. Not to collect the excess of accelerated depreciation over straight-line depreciation in such circumstances would be to permit a clear derogation from the public policy manifested in the legislative arrangement.

In opposition to such strong public interest stands the relatively weak private interest of the provider that voluntarily terminated its participation in the Medicare program. On the one hand, to the extent that such provider planned from the start to take advantage of the accelerated depreciation formula by dropping out of the program after being reimbursed in accordance with the higher rates available under such formula, the provider's expectation concededly was foiled by the recapture regulation. But "[w]hile such an expectation may not be wholly illegitimate, it would seem to have nothing to recommend it other than the traditional desire to take advantage of a loophole."[33] Assuming, on the other hand, that the provider left the program for nonsuspect reasons, it expected to be reimbursed only for its "reasonable cost," and consequently its expectation was not upset at all.

We may further accept, without deciding, that the public interest in recovering over-

---

**31.** 42 U.S.C. § 1395x(v)(1)(A)(i).

**32.** *Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077, 1081 (1st Cir. 1978).

**33.** *Id.*

payments justifies the retroactive application of the depreciation recapture regulation to those providers that, though they have not formally ended their relationship with the Medicare program, have effectively achieved such a result by substantially decreasing to a nominal figure the proportion of Medicare patients under their care. Vindication of the public interest in curing defects in the regulatory scheme must not be hampered by such formalistic distinctions as whether the provider terminated its participation officially, or merely construc-. tively.

Nevertheless, in our view, the balance between public and private interests shifts dramatically in the situation where the regulation is applied retroactively to recapture excess accelerated depreciation from a home in the Center's situation. When a provider continues to participate actively in the Medicare program, as the Center does, the public interest in forcing such a provider to change from an accelerated method to the straight-line formula is minimal, since there is no indication that such provider is taking undue advantage of the program. Even if the provider suffers a decline in Medicare patients during one or more years, it may well experience higher levels of utilization in subsequent years. In such event, the losses to the Medicare program from that one year will have been more than compensated for by the increased use of the facility during later years. Thus, only after Medicare utilization over the entire useful life of the asset is assessed can it be determined whether the provider has been overpaid for the services it actually rendered.

Indeed, the facts of the present case amply demonstrate this point. During the base period consisting of the years 1971 and 1972, the Center experienced a Medicare utilization of 31.29 percent. In 1973, its utilization was only 16.47 percent, a drop of 47.36 percent from the base period.[34] However, based upon figures adverted to by the Center and not disputed by the government, the Center's utilization by Medicare patients increased markedly in the two subsequent years, so that for the fiscal period ending December 31, 1975, its Medicare utilization was 41.89 percent.[35] Should this trend continue, the years of plenty may well make up for the lean years.[36]

Admittedly, there remains some marginal public interest in having the recapture regulation apply retroactively to a provider in the Center's position. Administrative convenience may suggest that once a substantial decline in utilization during any year indicates the possibility that an overpayment will eventually result, the Secretary need not wait for the useful life of the capital asset to elapse, but may recapture the excess accelerated depreciation immediately. Certainly this public interest—despite its relative insignificance—may justify prospective application of the recapture regulation because it is reasonably related to the underlying legislative purpose; it cannot, however, support retroactive application of that provision in the face of the weighty, countervailing private interests affected here.

In a retroactivity challenge, such as the present one, a critical question is how the challenger's conduct, or the conduct of others in its class, would have differed if the rule in issue had applied from the start.[37] In the Center's case, that question may be answered with a degree of certainty. Had the Center been apprised in 1967, when it first joined the Medicare program, that upon choosing to depreciate its capital assets on an accelerated basis it also assumed the risk that should its utilization by Medicare patients substantially decrease in the future it would be vulnerable to recapture of the excess depreciation already tak-

---

34. *See* note 8 *supra*.

35. During the year ending December 31, 1975, 4,342 days out of 10,365 total inpatient days were attributable to Medicare. Appellant's brief at 5.

36. *Cf.* Genesis 41:30.

37. *See Adams Nursing Home, supra* at 1081. *See also Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17 & n.16, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Slawson, supra* note 27, at 225–26.

en, the Center undoubtedly would have opted for the straight-line method. The assumption by the Center of that formidable risk, whose fruition might well have a grievous effect on its cash flow and capital acquisition plans, probably would not have been warranted inasmuch as both methods of depreciation would in the end produce the same amount of reimbursement for its costs. But the Center was not so apprised, and drew up its financial plans upon the expectation that it may calculate the "reasonable cost" of its capital assets on an accelerated basis. When the "rules of the game" were suddenly modified, HEW claimed that the Center owed the Medicare program over $148,000. This severe impact upon the Center's finances, overturning its settled expectations, outweighs the negligible public interest in applying the new provision retroactively to it.[38]

Our decision not to apply the recapture regulation retroactively in the present case is influenced by an additional factor: The Review Board found that the decrease in the Center's utilization by Medicare patients in 1973 was substantially related to the imposition in 1971 of more stringent requirements for eligibility for Medicare benefits. Inasmuch as the decline here was precipitated by governmental action rather than by any conduct on the part of the Center, it does not seem appropriate for HEW first to set up the cause and then to punish the provider for its consequences.

■ Our holding is a narrow one. We do not review the approach that was adopted by HEW to remedy a perceived abuse with the attitude that, "as a matter of constitutional law, a scheme more attuned to the equities of a particular provider's situation 'would have been wiser or more practical under the circumstances . . .' "[39] Indeed, our decision leaves intact the objec-

tives as well as the details of the curative measure conceived by HEW and enacted through legislative rulemaking as 20 C.F.R. § 405.415.[40] Rather, we address the limited issue whether such regulation should be applied retroactively, as dictated by a subsequent modification of the Provider Reimbursement Manual which, because of its assertedly interpretative nature, was promulgated without complying with the safeguards of the Administrative Procedure Act. Not to consider that question would be to abdicate our responsibility to protect the public from arbitrary bureaucratic action, a responsibility that is manifested in the doctrine that permits courts to substitute their judgment for that of administrative agencies when they review interpretative rules. Moreover, in relying upon the accepted balancing test to determine that the regulation should not be applied retroactively to the Center, we assiduously avoid substituting our judgment for that of the administrative agency as to what changes would make the scheme "wiser or more practical;" we leave it to the Secretary to make that determination. We hold only that the agency may not, by an interpretative rule, rewrite a position it had taken previously, and upon which a party had justifiably and materially relied, under the pretext that such retroactive modification is integral to a curative measure, when such retroactivity is not supported by the rationale underlying the curative measure and when at least part of the cause for the party's noncompliance with the curative measure is attributable to the agency.

In view of the result we reach, we need not address the constitutional issue pressed by the Center, namely whether the retroactive application to it of the depreciation recapture regulation deprives it of property without due process of law.[41]

---

**38.** *But see Summit Nursing Home, Inc. v. United States*, 572 F.2d 737 (Ct.Cl.1978).

**39.** *See* dissenting opinion at 26, *quoting Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

**40.** In this respect, the present case differs from *Turner Elkhorn Mining*, where invalidation of

the retroactive aspects of the 1972 Act would have struck at the heart of Congress' chosen approach for dealing with the problem before it. 428 U.S. at 18–19, 96 S.Ct. 2882.

**41.** *See, e. g., Dandridge v. Williams*, 397 U.S. 471, 475–76, 90 S.Ct. 1153, 1156, 25 L.Ed.2d 491 (1970) ("We consider the statutory ques-

## IV.

The judgment of the district court will be reversed with respect to the recapture of the excess of accelerated depreciation over straight-line depreciation for fiscal periods ending on or before December 31, 1969. With respect to such recapture for fiscal periods ending after December 31, 1969, the judgment of the district court will be affirmed, and the cause will be remanded for proceedings consistent with this opinion.

SEITZ, Chief Judge, dissenting.

According to my best reading, the majority holds that HEW impermissibly interpreted 20 C.F.R. § 405.415(d)(3) as allowing the recapture of excess reimbursable depreciation paid before the effective date of that regulation in a case where the affected provider decreased his participation in the Medicare program by more than twenty-five percent after the adoption of that regulation. Because I believe that section 405.-415(d)(3), on its face, calls for recapture of depreciation paid prior to its effective date and that the twenty-five-percent rule is a reasonable way to define the term "decrease" in that regulation, I dissent.

I differ with the majority about the source of the retroactivity in this case; I believe that a chronology of important events will illuminate our disagreement. The Center began its participation in the Medicare program in 1967. At that time it elected to use accelerated depreciation. In 1970, HEW banned the use of accelerated depreciation for assets acquired after August 1, 1970. In another regulation enacted at the same time, HEW announced that it would recapture any excess depreciation paid to providers who terminated or constructively terminated their participation in the program:

> When a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health

insurance proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable costs determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program using the straight-line method of depreciation will be recovered . . . .

20 C.F.R. § 405.415(d)(3) [presently codified at 42 C.F.R. § 405.415(d)(3)(i) (1977)]. In 1972, HEW issued a revised "Provider Reimbursement Manual" containing two items relevant to this case. First, according to the Manual, section 405.415(d)(3) was to be applied retroactively. Second, a decrease of twenty-five percent or more in a provider's "ratio of health insurance days to total inpatient days" would be deemed substantial enough to trigger the recapture of any excess depreciation. In 1973, the Center's participation fell below this twenty-five percent threshold. The Secretary subsequently attempted to recapture excess depreciation, as defined by section 405.-415(d)(3), for each year since 1967.

I agree with the majority that the Secretary had statutory authority to adopt a regulation with retroactive effect. I cannot agree, however, that section 405.415(d)(3) required any subsequent administrative gloss to make its retroactive import clear; it had retroactive impact *ab initio.* Upon a provider's termination, HEW is entitled to recover "the excess of reimbursable cost determined by using accelerated depreciation methods *and paid under the program* over the reimbursable cost which would have been determined *and paid under the program* by using the straight-line method . . ." [emphasis added] As later noted in the Manual, this provision does not reach providers who terminated before its effective date. But any provider who terminates after the effective date clearly is

---

tion first, because if the appellees' position on this question is correct, there is no occasion to reach the constitutional issues"); *Ashwander*

*v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

liable for the difference between the costs he had claimed using accelerated depreciation and the costs that he would have claimed had he used the straight-line method. This calculation is, by necessity, retrospective. A provider who terminated the day after this regulation became effective would be liable for overpayments for all prior years. No other reading of section 405.415(d)(3) makes sense.

Identifying the source of retroactivity is imperative here. The majority strikes down retroactive recovery from the Center because the Manual was an interpretative measure not promulgated under the Administrative Procedure Act. Two illustrations, however, demonstrate that retroactivity predated the interpretative Manual. First, if a provider had constructively terminated its participation—however the majority wishes to define that event—after 1970 but prior to the adoption of the twenty-five-percent rule in 1972, the Secretary could have invoked the plain terms of section 405.415(d)(3) and could have recovered all overpayments, including those preceding 1970. Second, if the Manual created any offensive retroactivity, then the Secretary should not be entitled to recover any depreciation accruing before 1972. Nevertheless, the majority allows the Secretary's recovery to date back to 1970, the effective date of section 405.415(d)(3), the true source of retroactivity in this case.

The majority, of course, is not "interpreting" section 405.415(d)(3) at all. Instead, it concludes that the twenty-five-percent rule is "fair" only when section 405.415(d)(3) is used to recover overpayments made after 1970. Presumably the majority would require a more significant decrease before allowing the Secretary to recover overpayments predating 1970. In rationalizing this unusual reading of the underlying regulation, the majority seems to invoke principles of estoppel. The Reimbursement Review Board did indeed assert that the government was partially responsible for the Center's predicament. The Commissioner of Social Security, however, contradicted this assertion when he reviewed the Board's decision; the district court affirmed the Commissioner's decision. The majority fails to give any explanation for rejecting the Commissioner's finding.

Turning to appellant's constitutional arguments, I believe that the correct standard of constitutional review for any authorized enactment, legislative or administrative, prospective or retrospective, is that stated by the Supreme Court in *Usery v. Turner Elkhorn Mining*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976):

> . . . [L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. . . .

*See also, Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977). Because the Center has not met its burden of demonstrating that this regulatory scheme is not rationally related to the valid legislative purpose of ensuring that the agency's methods of cost reimbursement do not overcompensate providers for their services to Medicare patients, I would sustain retroactive application of this regulation. *See Summit Nursing Home, Inc. v. United States*, 572 F.2d 737 (Ct.Cl.1978). In the words of the Supreme Court, a court may not say as a matter of constitutional law that a regulatory scheme more attuned to the equities of an individual provider's situation "would have been wiser or more practical under the circumstances . . . ." *Turner Elkhorn Mining, supra*, 428 U.S. at 19, 96 S.Ct. at 2894.

I would affirm the judgment of the district court.