Montgomery County Geriatric and Rehabilitation Center, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued May 11, 1983, before Judges ROGERS, BLATT and CRAIG, sitting as a panel of three.

*Douglas B. Briedenbach*, with him *Howard E. Kalis, III, Binder, Kalis, Proctor & Briedenbach,* for petitioner.

*Jeffrey Gonick,* Assistant Counsel, for respondent.

OPINION BY JUDGE CRAIG, June 27, 1983:

The Montgomery County Geriatric and Rehabilitation Center (geriatric center), a county-operated skilled nursing (SNF) and intermediate care (ICF) facility, appeals from a Pennsylvania Department of Public Welfare (DPW) order which, for the year ending December 31, 1978, (1) disallowed, as non-reimbursable, the cost of providing patients with barber and beauty shop services and clothing and (2) disallowed an accounting method used by the center to carry forward, to two succeeding cost reporting periods, certain costs disallowed in previous years. We affirm in part and reverse in part.

Although the hearing examiner made no findings of fact to facilitate review, uncontradicted testimony of record reveals that the geriatric center houses approximately 350 residents in its SNF and 241 residents in its ICF; approximately 98% of these patients are Medicaid recipients under Pennsylvania's Medical Assistance Program (program).[1] Under the program, each Medicaid patient receives a $25 monthly allowance for personal needs.

In 1978, the geriatric center provided patients with barber and beauty shop care but did not deduct the cost of that service from a recipient's personal account. Rather, it sought reimbursement from the Commonwealth. According to the uncontradicted testimony of the center's assistant administrator, Mrs. Jean John, a majority of the Medicaid recipients exhaust their monthly $25 allowance without paying for hair care services.

---

[1] Section 441.1-453 of the Public Welfare Code (Code), Act of June 13, 1967, P.L. 31, *as amended,* added by section 5 of the Act of July 31, 1968, P.L. 904, *as amended,* 62 P.S. §§441.1-453.

In 1978, the center also purchased shirts, trousers, sweaters, underwear, shoes and slippers for both male and female patients, stockings, slips, and simple cotton dresses for women, and hose for men, making such items available to residents on an as-needed basis. According to Mrs. John's testimony, the underwear provided is not labeled for each patient; if a patient is discharged or dies, the facility recirculates usable articles of clothing to other residents. The center labels dresses, shirts, and trousers with a resident's name so that after laundering, he receives an item previously fitted to his needs. After a patient's death or discharge, the facility removes the labels and returns usable articles to stock.

Thus, for its ambulatory patients, the geriatric center has, in effect, substituted street clothes for institutional gowns and now seeks reimbursement from the Commonwealth for the cost of providing that service.

Under its statutory authority to review expenses and adjust costs incurred by SNFs and ICFs furnishing care under the Medicaid program, the Department of the Auditor General examined the geriatric center's books and records for the year ending December 31, 1978, and informed Montgomery County by final settlement letter of November 3, 1980, that the Commonwealth would not reimburse the center for the expense of operating a barber and beauty shop or for the expense of providing residents with "additional patient personal clothing.... "[2]

The Auditor General based that determination on a July 5, 1979 memorandum from the director of the Bureau of Medical Assistance, Glenn Johnson, who in-

---

[2] November 3, 1980 report from John F. Ross, Jr., Office of the Auditor General to the Commissioners of Montgomery County at 4.

formed the bureau of state-aided audits that beauty and barber shop services should not be charged to the program and that "[i]f a County facility purchases streetwear for the residents, the cost of the personal clothes should be charged to the patient." According to the uncontradicted testimony of Raymond Rall, Jr., an auditor of facility records, the Auditor General had allowed barber and beauty shop costs to be charged to the program in the past.

The Auditor General also informed the geriatric center, apparently at a conference in March of 1980, that DPW no longer recognized an accounting principle under Medicare regulations[3] which permits facilities to carry forward reasonable costs disallowed in previous years. The geriatric center had relied upon these federal carry-forward regulations in 1978, seeking reimbursement for excess reasonable costs disallowed by DPW for the 1976-77 reporting periods.

On November 25, 1980, the center's administrator, Gus Arapolu, filed a timely appeal with DPW. After a formal hearing on July 2, 1981, a hearing examiner recommended that DPW deny the center's appeal in its entirety; the Secretary of DPW adopted that recommendation on October 27, 1981.

## Scope of Review

We limit our scope of review to a determination of whether DPW (1) adjudicated the issues in accordance with the law, (2) violated constitutional rights, or (3) failed to support findings of fact with substantial evidence. *Spicer v. Department of Public Welfare*, 58 Pa. Commonwealth Ct. 558, 560, 428 A.2d 1008, 1009 (1981). Here, the geriatric center asks our court to decide if DPW violated federal and state Medicaid legislation and regulations by disallowing reimburse-

---

[3] 42 C.F.R. §405.455(a).

ment for the services described above and by refusing to recognize the carry forward accounting method used by the facility in 1978.

Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396p, "establishes the Medicaid program under which participating States may provide federally funded medical assistance to needy persons." *Beal v. Doe*, 432 U.S. 438, 440 (1977) (footnotes omitted). It is a grant-in-aid project providing federal monies to participating states. *District of Columbia Podiatry Society v. District of Columbia*, 407 F. Supp. 1259, 1262 (D.D.C. 1975). Participation is voluntary, but for a state to receive federal funds, its approved plan must meet all the requirements of the federal statute, 42 U.S.C. §1396a, and implementing regulations. *Swanson v. Department of Health and Social Services*, 105 Wis.2d 78, 83, 312 N.W.2d 833, 836 (1981); *accord*, *White v. Beal*, 555 F.2d 1146 (3rd Cir. 1977) (Pennsylvania's provision for eye care inconsistent with federal regulation defining purpose of "eyeglasses").

Pennsylvania participates in the Medicaid program and has implemented a federally-approved plan for medical assistance, as mandated under the federal statute. *See* 62 P.S. §§441.1-453.

Congress enacted Medicaid legislation "[f]or the purpose of enabling each State, as far as practicable under the conditions in such state, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care.... " 42 U.S.C. §1396.

Although Title XIX confers broad discretion on each state to design Medicaid benefit programs tailored to meet its needs and demands, *Beal v. Doe*, 432 U.S.

438, 444 (1977), that discretion is not unbridled. *Dodson v. Parham*, 427 F. Supp. 97 (N.D. Ga. 1977).

In construing the language of the federal statute and its supplementary rules and regulations, we must recognize the remedial nature of the legislation and accordingly construe its terms liberally. *Brooks v. Smith*, 356 A.2d 723 (Me. 1976) (state agency may not deny orthodontia to child where scheme of federal statutes, regulations, and interpretive guidelines appear to require reimbursement for such service). By the same token, we must accord an administrative agency's interpretation of its own regulations controlling weight, unless (1) that interpretation is plainly erroneous or inconsistent with the regulations or (2) unless the regulations are inconsistent with the underlying legislative scheme. *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 81, 422 A.2d 480, 482 (1980) (court defers to DPW's interpretation of medical assistance regulations concerning emergency room physician coverage). *Compare Luhovey v. Department of Public Welfare*, 36 Pa. Commonwealth Ct. 126, 387 A.2d 978 (1978) (DPW's food stamp regulations in harmony with federal regulations governing distribution) *with Forbes Health Systems v. Harris*, 661 F.2d 282, 285-86 (3rd Cir. 1981) (court relies on DPW's own practices rather than its current interpretation of regulations when such interpretation flatly contradicts prior practice) *and White v. Beal*, 555 F.2d 1146 (DPW's interpretation of state regulations which deny benefits on basis of disability and not medical necessity inconsistent with federal statute and regulations which prohibit such discrimination).

Given these parameters, we find that DPW's interpretation of its hair care regulations is inconsistent with the federal medical assistance program. We will not disturb, however, DPW's clothing and accounting method determinations.

*Hair Care Services*

In support of its refusal to reimburse the geriatric center for the cost of providing hair care services, DPW relies upon regulations from its Medical Assistance Manual (MAM), specifically, sections 9424.85 (for skilled nursing patients) and 9425.85 (for intermediate care patients), which state, in pertinent part:

*Expenditure of Funds from the General Patient Fund Account*

[A] facility may neither bill a patient for undelivered services or excessive personal services such as manicures, haircuts, hair styling, laundry, dry cleaning, etc. nor charge more than the facility's incurred costs or the prevailing fees for such services in the local community.[4]

DPW contends that, because sections 9424.85 and 9425.85 label haircuts and hairstyling "personal services," the medical assistance patient must pay for them. As further support, DPW quotes federal regulations at 42 C.F.R. §§435.725(c)(1)(i) and 435.832(c)(1)(i),[5] which provide that institutionalized categorically and medically needy individuals are entitled to an allowance of $25 "for clothing and other personal needs of the individual while in the institution." From DPW's perspective "other personal needs" includes hair care.

The geriatric center submits that DPW's refusal to reimburse the center for hair care services violates the

---

[4] These regulations were published and adopted at 7 Pa. B. 2181, 2182, and 2185 (1977) under DPW's legislative rule-making authority. *See* sections 201(1) and (2), 403(b), and 443.1(2) and (3) of the Code, 62 P.S. §§201(1)-(2), 403(b), and 443.1(2)-(3).

[5] At the time of this controversy, §435.832(c)(1)(i) was located at 42 C.F.R. 435.813(b)(1). *See* 45 F.R. 24878 (April 11, 1980).

intent of Congress when it enacted Title XIX and jeopardizes the center's right to continued participation in the Medicaid program. For support, the center relies upon 42 U.S.C. §1396a(a)(26)(B)(ii), which requires that states periodically review the adequacy of service available in SNFs "to meet the current health needs and promote the maximum physical well-being of patients..., " and upon 42 U.S.C. §1396a(a)(19), which requires that states provide safeguards necessary to assure that care and services "will be provided in a manner consistent with ... the best interests of the recipients.... "

Although such language evinces a strong federal concern for the health and welfare of indigent Medicaid recipients, it does not expressly mandate that a state reimburse facilities for the cost of providing hair care service. Mindful that 42 U.S.C. §1396 vests Pennsylvania with discretion to tailor its Medicaid program to the particular needs of the Commonwealth, *Beal v. Doe*, we cannot say that DPW's interpretation of MAM sections 9424.85 and 9425.85 necessarily conflicts with the "maximum physical well-being" and "best interest" provisions of Title XIX. *Cf. Philadelphia Welfare Rights Organization v. O'Bannon*, 517 F. Supp. 501 (E.D. Pa. 1981) ("best interest" provision of federal statutory scheme has limited role and cannot be used to force DPW to rewrite budget after DPW determined that Commonwealth lacked funds necessary to provide eyeglasses to adults).

DPW's interpretation of MAM sections 9424.85 and 9425.85, however, conflicts with federal regulations which specify the certification requirements that an SNF must meet as a qualified Medicaid provider, *see* 42 C.F.R. §442.200 *et seq.*; that conflict appears to jeopardize the geriatric center's right to continued participation in the Medicaid program.

Specifically, under 42 C.F.R. §442.202, an SNF participating in the Medicaid program "must meet (a) the definition of a 'skilled nursing facility' in [42 C.F.R.] §440.40(a).... " Under 42 C.F.R. §440.40(a)(ii), "[s]killed nursing facility services ... means services that are ... (ii) Provided by ... a facility or distinct part of a facility that is certified to meet the requirements for participation under Subpart C of Part 442.... " Under section 442.20(a)(1) of Subpart C, 42 C.F.R. §442.20(a)(1), "[t]he Medicaid agency's agreement with an SNF participating in Medicare *must* (1) *Provide for the same terms and conditions as Medicare certification.*" (Emphasis added.) Because the geriatric facility here is an SNF participating in Medicare, it must meet, as a Medicaid provider, Medicare certification conditions.

As a condition of participation in the Medicare program, an SNF must see that its policies are "designed *to ensure* that each patient ... is kept comfortable, clean, *well-groomed*, and protected from accident, injury, and infection." 42 C.F.R. §405.1124(c) (emphasis added). Thus, as a condition of participation in the Medicaid program under 43 C.F.R. §442.20(a)(1), an SNF must also see that its *Medicaid* recipients are well-groomed.

DPW insists that "well-groomed" does not embrace basic hair care. We disagree. According to the *Oxford English Dictionary*, "well-groomed" means "neat and trim, spick and span, with hair, skin, etc. carefully tended."[6] As Mrs. John testified, a majority of the center's indigent residents exhaust their monthly allowance without paying for hair care; without reimbursement from the Commonwealth for this basic, reasonable, and necessary service, the geriatric center

---

[6] Oxford English Dictionary 296 (1971).

could not meet the federal government's mandate that a facility keep its patients well-groomed.

HIM-12, the federal government's Extended Care Facility Manual, designed for SNF use under the Medicare program, is also instructive, because it indicates that a basic level of hair care service may be contemplated by the Health Care Financing Administration and reveals that use of the word "personal" in the federal scheme does not necessarily mean "nonreimbursable." Section 280.5[7] provides:

> Basic personal services such as simple barber and beautician services (e.g., shaves, haircuts, shampoos, and simple hair sets) which patients need and cannot perform for themselves may be viewed as ordinary patient care when furnished by a long-stay institution. Such services are covered costs reimbursable under Part A when included in the flat rate charge and provided routinely without charge to the patient by an SNF. *The services are maintenance of at*

---

[7] The U. S. Department of Health and Human Services issues a variety of Medicare guidelines called Health Insurance Manuals or HIMs. They are designed to amplify the basic statutory and regulatory provisions for coverage of service but do not have the effect of regulations. Section 280.5 of the Extended Care Facility Manual (HIM-12) may be found at 1 Medicare and Medicaid Guidelines (CCH) ¶4075.

Because they are not issued in accordance with the procedures specified in the Administrative Procedure Act, HIM guidelines are merely interpretive rules. *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1255 (3rd Cir. 1978). Interpretive rules, while not controlling upon the courts, constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The weight of such a ruling depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.*

*least a minimum level of personal hygiene, decency, and presentability essential to the well-being of the patient himself and of other patients who must associate with him.* However, under the personal comfort exclusion, more elaborate services, such as professional manicures, hair styling, etc. are excluded even when furnished routinely.... (Emphasis added.)

Given the federal regulations and their interpretive guidelines, we conclude that DPW must reimburse the center for basic hair care service.

However, because testimony of record reveals that the center also provided occasional haircutting service for its employees, which would not be a reimbursable item, DPW must determine the extent to which the geriatric center sought reimbursement for the cost of providing haircuts to employees and deduct that amount from the total owed to it.

## Clothing

The geriatric center contends that its substitution of street clothes for institutionalized attire best serves the physical and psychological needs of patients and that, in fact, the cost of providing gowns and robes on a 24-hour basis would exceed the cost of providing ambulatory Medicaid recipients with civilian wear. For support, the geriatric center relies upon the "maximum physical well-being," 42 U.S.C. §1396a(a)(26)(B)(ii) and "best interest of the recipient," 42 U.S.C. §1396a(a)(19), provisions of Title XIX and upon 42 C.F.R. §405.1121(k)(9), which requires facilities to treat each patient with "consideration, respect, and full recognition of his dignity and individuality, including privacy in treatment and in care of his personal needs."

As we noted earlier, general statutory language, such as the "best interest" provision of Title XIX, plays

a limited role in disposing of specific reimbursement issues and should not be used by courts to rewrite state Medicaid budgets. *Philadelphia Welfare Rights Organization*, 517 F. Supp. at 508.

Section 405.1121(k)(9) of the federal regulations proves more problematic, because, arguably, a facility enhances a recipient's dignity and individuality by providing ambulatory patients with non-institutional-looking attire. DPW, however, maintains that the clothing provided here constitutes a nonreimbursable personal item under 42 C.F.R. §435.832(c)(1)(i)[8] and 435.725(c)(1)(i), which provide, in pertinent part:

> (c) In reducing its payment to the institution, the agency must deduct ... from the individual's total income ...

> (1) A personal needs allowance that is reasonable in amount for clothing and other personal needs of the individual while in the institution. This protected personal needs allowance must be at least—

> (i) $25 a month for an aged, blind, or disabled individual....

DPW's interpretation is neither plainly erroneous nor inconsistent with a legislative scheme which grants participating states considerable freedom in designing and funding their Medicaid programs. *Doe v. Colautti*, 454 F. Supp. 621, 630 (E.D. Pa. 1978). Therefore, sensitive as we are to the geriatric center's attempt to humanize living conditions for its Medicaid recipients, we must defer to DPW's interpretation of the federal regulations. *Forbes Health System* at 82, 422 A.2d at 482.

### Accounting Method

County nursing facilities which provide care under the medical assistance program receive appropriate

---

[8] See footnote 5.

state and federal funds under Medicare reimbursement principles. MAM §§9424.713 and 9425.912.[9] These principles, found at 42 C.F.R. §§405.401-405.461, state, among other things, that providers will be paid the lesser of the reasonable cost of services furnished to beneficiaries or a provider's customary charges for those services. 42 C.F.R. §405.455(a).[10] Because of this test, so-called "reasonable" costs are not always reimbursed; accordingly, the federal regulations permit a facility to recapture its unreimbursed reasonable costs by carrying them forward to two successive reporting periods. 42 C.F.R. §405.455(d). *See also* HIM-15, §2614, 2 Medicare and Medicaid Guide (CCH) ¶7592.

DPW submits that, on October 14, 1978, it promulgated regulations which do not permit county SNFs and ICFs to recapture unreimbursed Medicaid costs in subsequent reporting periods. The 1978 regulations provide:

> Costs which are not reimbursed within the established ceilings for any calendar year will not be carried forward or backward to other calendar years.

---

[9] These regulations were published at 8 Pa. B. 2826, 2828 and 2831 (1978).

[10] Under 42 U.S.C. §1395x(v)(1)(A), "[t]he reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services.... " *See also* sections 2100 and 2102.1 of the Provider Reimbursement Manual (HIM-15), 1 Medicare & Medicaid Guidelines (CCH) ¶5854 and 5858.

Customary charges are "those uniform charges listed in a provider's established charge schedule which is in effect and applied consistently to most patients and recognized for program reimbursement." Section 2604.3 of HIM-15, 1 Medicare & Medicaid Guidelines (CCH) ¶7580. To be considered customary charges, "they must be imposed uniformly on most patients and actually be collected from a substantial percentage of patients liable for payment on a charge basis." *Id.*

MAM §§9424.713 (SNFs) and 9425.912 (ICFs).[11]

The geriatric center contends that this prohibition against recapture applies only to unreimbursed costs which exceed the published statewide per-diem ceiling on net operating costs for county SNFs and ICFs[12] and not to unreimbursed costs which exceed customary charges.

The prohibition against recapture, quoted above, clearly applies to facility costs which are not reasonable because they exceed "established ceilings for any calendar year.... " What are these established ceilings? The regulations do not say. DPW submits that the reference to ceilings includes, but is not limited to, the reasonable cost — customary charge restrictions imposed on facilities under Medicare regulations. That interpretation is neither plainly erroneous nor necessarily inconsistent with the language of the regulations. *Forbes Health System* at 81, 422 A.2d at 482. Accordingly, we must reject the geriatric center's more limited interpretation of the regulation.

The geriatric center also contends tht the Commonwealth's prohibition against Medicaid cost recapture contravenes a published federal regulation and, therefore, cannot stand. We disagree. The geriatric center has not directed our attention to any federal statute or regulation which expressly binds state Medicaid reimbursement methods to the specific Medicare cost recapture principle at issue here. Moreover, the federal regulations governing Medicare cost reimbursement principles are designed to accom-

---

[11] See footnote 9.

[12] Sections 9424.713 and 9425.912 also state that county facilities will be reimbursed under Medicare principles "subject to a ceiling based on the statewide weighted average per diem cost of such facilities." That statewide ceiling on net operating costs is $42 for county SNFs, §9424-Appendix XV, and $29.50 for county ICFs, §9425-Appendix IV.

modate specific state needs. Indeed, 45 C.F.R. §405.401(d) expressly provides that "[i]n consideration of the wide variations in size and scope of services of providers and regional differences that exist, the principles are flexible on many points."

Finally, the geriatric center contends that DPW's actions were unfair because (1) the department did not provide public notice of its intention to adopt the 1978 regulations and (2) that, by the time the auditor informed the center in 1980 that DPW would not recognize cost recapture under Medicaid, it could no longer recover its unreimbursed costs for 1976-77 under a nine-month carry forward scheme allegedly in effect. In essence, the center argues that DPW unfairly changed the rules of the reimbursement game in midcourse by publishing regulations in 1978 which upset the facility's expectation of recapturing its 1976-77 disallowed costs in 1978.

First, we note that DPW legally published its regulations without prior notice and comment under section 204 of the Commonwealth Documents Law,[13] which permits an agency to dispense with notice and comment when "the agency for good cause finds ... that the [notice and comment] procedures specified in sections 201 and 202 are in the circumstances impracticable, unnecessary, or contrary to the public interest."

Here, DPW made a finding that prior notice and comment was unnecessary, stating that adoption of the regulations merely brought the Commonwealth into compliance with the 1972 federal mandate that Medicaid payments be made on a cost-related basis after July 1, 1976. Thus, having complied with section 204, DPW had no obligation to provide prior notice and comment.

---

[13] Act of July 31, 1968, P.L. 769, 45 P.S. §1204.

Second, at the hearing, DPW offered, as evidence of actual notice, Memorandum No. 6, which reveals that public and private SNFs and ICFs, county commissioners, regional deputy secretaries, and county assistance officers were notified of DPW's policy in July of 1980. That memorandum stated:

Although Medicare regulations allow facilities to carry over ... reasonable costs not reimbursed due to the lower of reasonable cost or customary charge provisions, Medical Assistance regulations do not.

*Costs that are not recognized as allowable costs under Medical Assistance regulations in a fiscal year may not be carried forward or backward to other fiscal years....* (Emphasis in original.)

Although the center claims that it never received Memorandum No. 6, it only supported this charge at the hearing with the hearsay testimony of Mr. Dwayne Hudson, a self-employed health care consultant who attended the 1980 settlement conference with DPW.[14] Even without the memorandum, however, the center was on notice of DPW's carry-forward prohibition when the department published its regulations in October of 1978. If it had questions about the scope or legality of the recapture prohibition, the center could have written to DPW for clarification or comment, as provided in the regulation. *Cf. State Dental Council and Examining Board v. Pollock*, 457 Pa. 264, 275-76, 318 A.2d 910, 917 (1974) (where regulations provided name and address of authorities to contact, who needs

---

[14] Mr. Hudson testified:
A. He (State Auditor Edward Woomer) informed us at exit conference that some of the evidence introduced prior by the Commonwealth, meaning the letters from Mr. Glenn Johnson, were indeed not received by the facility or sent.

further advice about dental regulations should have consulted authorities).

Also, the geriatric center has not shown, by competent evidence, that DPW had a nine-month cost-recapture policy in effect in 1980. Again, only Mr. Hudson testified about DPW's alleged nine-month policy and his testimony was hearsay.[15]

Finally, as to the issue of unfairness, we find *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250 (3rd Cir. 1978) instructive. In 1970, the then-Department of Health, Education, and Welfare (HEW, now HHS) amended its Medicare regulations to require the government to recapture from any provider that abandoned the program or experienced a substantial decrease in Medicare utilization the excess reimbursement that resulted from a provider having depreciated its assets under an accelerated, rather than straight-line, method. As noted by the Third Circuit, HEW implemented the regulation to prevent providers from obtaining undeserved windfalls by opting for accelerated depreciation and then leaving the program, thereby recovering reimbursement for costs never incurred. 590 F.2d at 1260-61.

HEW went further than the regulations, however, by announcing in its Provider Reimbursement Manual (HIM-15) that the new regulations would be applied retroactively to recover excess reimbursements from

---

[15] Mr. Hudson testified:

Q. Is there any regulation of which you are aware which reduces the two-year period which had been previously set forth in HIM 15-2614?

A. Nothing in print. Here again I'd like to reiterate the chronological order of the exit conference, at which point Mr. Woomer told us that while HIM15 was stated (sic), they did not choose—"they" meaning the Auditor General's office—did not choose to use the two-year time limitation on any recovery and that for county facilities they would use a nine-month recovery period.

pre-1970 fiscal years. Relying upon HIM-15 in 1975, HEW assessed Miriam Center, an underutilized non-profit Medicare provider, approximately $148,000, the amount that could be recouped under the regulation from 1967 to 1972.

Noting that Miriam Center had experienced under-utilization only because of HEW's own stricter Medicare eligibility requirements and that HEW relied only upon an interpretive rule for its action, the Third Circuit reversed HEW's action, holding that an agency "may not, by an interpretive rule, rewrite a position it had taken previously, and upon which a party had justifiably and materially relied," when such a retroactive modification did not further the curative purpose of the 1970 amendment.

In arriving at its decision, however, the Third Circuit observed that an agency must occasionally modify its validly published regulations to meet changing circumstances and that such curative measures "usually are treated deferentially by the courts, even when they upset the expectations of private parties." 590 F.2d at 1252. Although retroactive measures — whether promulgated by a legislature or by an administrative agency — are traditionally subject to stricter scrutiny than prospective measures, *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976), they are sustained nonethless, so long as the public interest in the rule overrides the private interests overturned by it. 590 F.2d 1260.

Here, presumably, DPW released the Medicaid program from the cost recapture provisions of Medicare because of limited state resources. As other courts have observed, the need for flexibility in the Medicaid program is mandated by financial considerations:

Title XIX is a welfare assistance program with limited funding. It is not an insurance program

such as Medicare.... Therefore, it is necessary for Medicaid funds to be used in the most economical manner possible, and it has been left to the States, operating within the Federal guidelines, to make such economic determinations.

*District of Columbia Podiatry Society v. District of Columbia*, 407 F. Supp. 1259, 1264 (D.D.C. 1975); *cf. White v. Beal*, 555 F.2d at 1149 (soaring cost of medical assistance is matter of national concern and state's interest in financial responsibility may not be treated lightly).

The geriatric center's interest in a consistent DPW accounting policy is legitimate but it does not override the Commonwealth's interest in maintaining a solvent Medicaid program.

## ORDER

Now, June 27, 1983, the order of the Pennsylvania Department of Public Welfare (DPW), dated October 27, 1981, is affirmed in part and reversed in part, as follows:

(1)  as to the issue of basic hair care, we reverse DPW's order and direct that the Commonwealth shall reimburse Montgomery County Geriatric and Rehabilitation Center for the amount which it expended for patient hair care in 1978, and, to determine that amount, DPW is directed, with the taking of additional evidence if necessary, to exclude from reimbursement any sum attributable to the cost of providing haircuts to employees of the center;

(2)  as to the issue of clothing, we affirm DPW's order; and

(3)  as to the issue of accounting methods employed, we affirm DPW's order.