514 A.2d 1003

Tenant Action Group, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 12, 1986, before Judge MacPHAIL, and Senior Judges ROGERS and BARBIERI, sitting as a panel of three.

*Janet Parrish,* for petitioner.

*Terrence J. Buda,* Assistant Counsel, with him, *Louise A. Knight,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

OPINION BY JUDGE MACPHAIL, September 11, 1986:

Tenant Action Group (TAG) appeals from a final declaratory order of the Pennsylvania Public Utility Commission (PUC). We reverse.

This case arises out of the settlement of the formal complaints of four individual tenants whose landlords were delinquent in paying their electric bills to the Philadelphia Electric Company (PECO). The tenants claimed that PECO had violated Sections 1521-1533 of the Public Utility Code (Code)[1] and the PUC's accompanying regulations found at 52 Pa. Code §§56.121-56.126. This portion of the Code and the regulations require advance notice to both landlord/ratepayers and their affected tenants before termination of service due to delinquent payments. They also provide for the right of tenants to retain service by paying the bill for the prior 30 days service and to continue this process in successive months. The amount paid by the tenant to the utility may be deducted from the tenant's rent.

Although it is not made clear from the record certified to us, the parties agree in their briefs that as part of the settlement, TAG and PECO formulated revised, comprehensive landlord-tenant termination procedures to be used from that point on by PECO. The PUC's Bureau of Consumer Services agreed to all of the procedures, with one exception: what procedure to follow where an affected tenant is seriously ill. TAG and PECO agreed that the tenants should be afforded the protections provided by the PUC's regulations to all other seriously ill residents facing termination of service. These regulations are found at 52 Pa. Code §§56.111-56.118 under the heading "Emergency Provisions." The Bureau of Consumer Services agreed to the temporary inclusion of the Emergency Provisions in

---

[1] 66 Pa. C. S. §§1521-1533.

PECO's landlord-tenant termination procedures on the condition that PECO and TAG would seek a declaratory order from the PUC to settle the question.

By order entered April 18, 1985, the PUC ruled that the Emergency Provisions found at 52 Pa. Code §§56.111-56.118 do not apply to tenants where their service has been terminated due to a landlord's failure to pay his bill. The PUC held that such terminations are governed by Sections 1521-1533 of the Code and the accompanying regulations, found at 52 Pa. Code §§56-.121-56.126. It reasoned that because the Emergency Provisions are not mentioned in either these Public Utility Code sections or the accompanying regulations the emergency provisions must not apply to the landlord-tenant situation. We disagree.

In our analysis, we keep in mind that our scope of review in PUC cases is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are, or are not, supported by substantial evidence. *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985). Because no evidence was taken and no factual findings were made, we must look for errors of law or violations of constitutional rights. We find that the PUC made an error of law.

The PUC correctly notes in its order that the Emergency Provisions regulations, at 52 Pa. Code §§56.111-56.118, were promulgated before the landlord-tenant provisions of the Code at 66 Pa. C. S. §§1521-1533 were enacted or the accompanying regulations at 52 Pa. Code §§56.121-56.126 were promulgated. The Emergency Provisions state in relevant part:

No utility shall terminate, or refuse to restore, service to *any* premises when *any occupant therein* is certified by a physician to be

> seriously ill or affected with a medical condition which will be aggravated by a cessation of service or failure to restore service.

52 Pa. Code §56.111 (emphasis added). "Occupant" is defined earlier in Chapter 56 as "*[a]ny* person who resides in the premises to which utility service is provided." 52 Pa. Code §56.2 (emphasis added). The provisions also provide that "[s]ervice shall not be terminated for the time period specified in a medical certification" and that "the maximum length of the certification shall be 30 days." 52 Pa. Code §56.114. The certificate may be renewed, however. *Id*. Finally, "[w]henever service is restored or termination postponed pursuant to the medical emergency procedures, the ratepayer shall retain a duty to equitably arrange to make payment on all bills." 52 Pa. Code §56.116.

If we consider only the clear language of the Emergency Provisions, it would seem obvious that tenants are included. 52 Pa. Code §56.111 prohibits termination to *any* premises when *any* occupant is certified to be seriously ill. The regulation is not restricted to either those who own the premises they live in or those who actually pay the utility bill.[2]

---

[2] We note that the term "ratepayer" is also defined earlier in Chapter 56 at 52 Pa. Code §56.2. The PUC chose not to use the term "ratepayer" in 52 Pa. Code §56.111.

Further, we note the following language from 52 Pa. Code §56.97, a regulation dealing with terminations in general:

> (a) If, at any time after the issuance of the initial termination notice and prior to the actual termination of service, a ratepayer *or occupant* contacts the utility concerning a proposed termination, an authorized utility employe shall fully explain:
>
> . . . .
>
> (6) the medical emergency procedure. (Emphasis added.)

This regulation requires a utility to inform any occupant who questions an impending termination about the medical emergency

This Court summarized the analytical process we must use in considering the validity of an agency's interpretation of its own regulations in *Harkins v. Department of Public Welfare,* 75 Pa. Commonwealth Ct. 454, 462 A.2d 894 (1983):

First, the Court must determine whether the interpretation is consistent with the regulation and second, whether the regulation is consistent with the statute under which it was promulgated. . . . Although the reviewing court makes these determinations, it must keep in mind that if the regulation of an administrative agency is consistent with the statute under which it is promulgated, then the agency's interpretation of its own regulations is entitled to great weight *except where the interpretation is plainly erroneous or inconsistent with the regulation.*

*Id.* at 461, 462 A.2d at 897 (emphasis added, citations omitted).

In this case the PUC attempts to invoke the provisions of Code sections enacted several months after the Emergency Provisions regulations were promulgated and the regulations promulgated to put those Code sections into effect to limit the language of the Emergency Provisions. We find this approach to be unsound. The later Code provisions and regulations were meant to protect tenants and give them additional rights, not take away those rights the tenants already had under the clear language of the Emergency Provisions. It is clear that remedial statutes, such as those code provi-

---

provisions. It would appear that 52 Pa. Code. §56.97 provides remedies, of sorts, for those who have received advance notice of terminations. It also provides some justification for why advance notice should be given in the first place. It would be a hollow act indeed to give tenants advance notice of termination, which the PUC acknowledges tenants are entitled to, without offering them all the remedies provided for by the regulations.

sions, are to be broadly and liberally construed to expand the rights of those who benefit, not to contract those rights. *See* 1 Pa. C. S. §1928(c); *Montgomery County Geriatric and Rehabilitation Center v. Department of Public Welfare,* 75 Pa. Commonwealth Ct. 248, 462 A.2d 325 (1983).

The PUC argues that the Landlord-Tenant provisions must take precedence over the Emergency Provisions because the former are more specific than the latter. We disagree. We believe that the Emergency Provisions, which deal with the special, out-of-the-ordinary situation where an "occupant" is seriously ill, are more specific than the Landlord-Tenant provisions and must take precedence in the situation where a tenant is seriously ill.

Furthermore, we believe that not applying the Emergency Provisions to tenants runs afoul of Section 1502 of the Code.[3] That Section provides that

> [n]o public utility shall, as to service, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to service, either as between localities or as between classes of service, but this section does not prohibit the establishment of reasonable classifications of service.

We feel that not applying the "Emergency Provisions" to tenants is an "unreasonable difference as to service" particularly in light of Section 1501 of the Code[4] which mandates that "service . . . shall be reasonably continuous and without unreasonable interruptions or delay."

---

[3] 66 Pa. C. S. §1502.
[4] 66 Pa. C. S. §1501.

The PUC committed an error of law when it held that the Emergency Provisions found at 52 Pa. Code §56.111-56.118 do not apply to landlord-tenant terminations. The PUC argues that the conclusion we adopt will be impractical because it will mean that where one individual in a multi-unit building is seriously ill, the utiltiy must continue providing service to all of the units even though the landlord is delinquent in paying his bill. Our reply to this argument is two-fold. First, not all tenants live in multi-unit facilities. Certainly if a landlord of a tenant in a single-unit dwelling is responsible for paying the utility and does not do so, there is no difference, as far as the utility is concerned, between applying the regulation to such a tenant and applying it to a homeowner. As for tenants in buildings with two, three or another relatively small number of units the burden on the utility does not increase greatly. Second, there are some situations where a utility possesses the technical capabilities of continuing service in one unit of a multi-unit facility while discontinuing service to the rest of the units.[5] The burden on the utility would again be no greater than applying the Emergency Provisions to a single family homeowner.

The order of the PUC is reversed.

---

[5] The legislature recognized this in the Code provisions dealing with discontinuance of service to leased premises:

(d) **Agreement for individual service.**—Any tenant of a residential building or mobile home park who has been notified of a proposed discontinuance of utility service pursuant to section 1523 (relating to notices before service to landlord discontinued) shall have the right to agree to subscribe for future service individually *if this can be accomplished without a major revision of distribution facilities or additional right-of-way acquisitions.*

Section 1527(d) of the Code, 66 Pa. C. S. §1527(d) (emphasis added).

### ORDER

The order of the Public Utility Commission entered April 18, 1985 numbered P-850006 is reversed.

Senior Judge ROGERS dissents.