609 F.Supp. 1421 (1985)
STATE OF ILLINOIS by the ILLINOIS DEPARTMENT OF PUBLIC AID, Plaintiff, Counter-Defendant,
v.
Margaret HECKLER, Secretary of the United States Department of Health and Human Services, and United States Department of Health and Human Services, Defendants, Counter-Plaintiffs.
No. 84 C 6343.
United States District Court, N.D. Illinois, E.D.
May 23, 1985.
*1422 Karen Konieczny, Chicago, Ill., for plaintiff, counter-defendant.
James J. Kubik, Asst. U.S. Atty., Chicago, Ill., for defendants, counter-plaintiffs.

MEMORANDUM OPINION AND ORDER
ASPEN, District Judge:
Medicaid is a welfare program which in theory is run cooperatively by state and *1423 federal agencies. This case reveals a breakdown of state-federal cooperation, or at least a communication breakdown. The State of Illinois ("Illinois") has sued Margaret Heckler, Secretary of U.S. Department of Health and Human Services ("the Secretary"), claiming that she is trying, to put it bluntly, to cheat it out of about $4,000,000 in federal reimbursement for medical services provided by Illinois. The Court is asked to review a decision of the Secretary's "Departmental Grant Appeals Board" ("the Board") which upheld an earlier administrative decision to disallow Illinois' claims for the $4,000,000. The parties have submitted cross-motions for summary judgment based upon a certified administrative record. For the reasons stated below, we grant the Secretary's motion and deny that of Illinois'.
The background of this case is somewhat complex and needs some elaboration. We will first sketch the relevant statutory and regulatory background. Then we shall describe the facts as revealed by the record, which show how Illinois came to believe it was entitled to the $4,000,000 in reimbursement. Finally, we will summarize the decision of the Board and explain why that decision must be upheld.

1. Statutory and Regulatory Background

Congress passed Title XIX of the Social Security Act ("Medicaid" or "Title XIX"), 42 U.S.C. § 1396 et seq., in 1965 to help provide certain medical services to the poor. The lifeblood of the program is federal money, which is given to the states, which in turn afford the services to the beneficiaries. 42 U.S.C. § 1396.
Under Title XIX, a state must designate one state agency to administer the State's Medicaid "plan."[1] 42 U.S.C. § 1396a(a)(5). In Illinois that agency is plaintiff Illinois Department of Public Aid ("IDPA"). IDPA must create and then implement a "plan for medical assistance" which is consistent with Title XIX and the Secretary's regulations. The plan describes the services covered, the method by which providers are reimbursed and the manner in which the program is administered. The plan is submitted to the Secretary for approval. After the plan is approved, the State becomes entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This federal reimbursement is called "federal financial participation," or in bureaucratic jargon, "FFP." IDPA had such an approved plan during the time period of this suit.
The term "medical assistance" encompasses a broad range of services, but in general excludes services of a type central to the dispute here  inpatient services to people of ages 22-64 in an "institution for mental diseases" ("IMD"):
(a) The term "medical assistance" means payment of part or all of the cost of the following care and services ...
(1) inpatient hospital services (other than services in an institution for ... mental diseases);
* * * * * *
(4)(A) skilled nursing facility services (other than services in an institution for ... mental diseases) ...
* * * * * *
(14) inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for ... mental diseases;
(15) intermediate care facility services (other than such services in an institution for ... mental diseases) ...

*1424 (16) effective January 1, 1973, inpatient psychiatric hospital services for individuals under age 21 ...
* * * * * *
except as otherwise provided in paragraph (16), such term does not include 
* * * * * *
(B) any such payments with respect to care of services for any individual who has not attained 65 years of age and who is a patient in an institution for ... mental diseases.
42 U.S.C. § 1396d(a). Despite the statute's seemingly clear exclusion of IMD services for patients between ages 22-64 ("the general IMD exclusion"), the dispute here centers about whether IDPA is entitled to FFP for exactly that type of service. The source of the dispute is conflicting interpretations of the Secretary's regulations promulgated under Title XIX.
The regulations in general echo the statute's general exclusion of IMD services to people between 21-65 years old. See 42 C.F.R. 435.1008(a)(2) (1984).[2] However, another part of this regulation can generally be read to create an exception to this general exclusion:
(a) Except as provided in paragraph (b) of this section, FFP is not available in expenditures for services provided to 
* * * * * *
(2) Individuals under age 65 who are patients in an institution for tuberculosis or mental diseases unless they are under age 22 and are receiving inpatient psychiatric services under § 440.160 of this subchapter.
(b) FFP is available in expenditures for services furnished to eligible individuals during the month in which they become ... patients in an institution for tuberculosis or mental diseases.
42 C.F.R. § 435.1008(a), (b). IDPA argues that this provision allows FFP for the first month of all "services," even otherwise excluded IMD services to those between 21 and 65. It reasons that this is consistent with the usual Medicaid rule of administrative convenience that the "month" is the interval of eligibility. See 42 C.F.R. § 435.914(b) (1984) (if individual is eligible for Medicaid at any time during a month, individual is eligible for entire month); S.Rep. 404, Part I, 89th Cong., 1st Sess. 82 (1965), reprinted in 1965 U.S.Code Cong. & Ad. News 1943, 2022 (for administrative convenience medical assistance may include payment for care provided any time during month individual becomes eligible). We will expand on Illinois' theory below, as its whole case turns on these provisions. But we turn first to what happened in this case between IDPA and HHS.

2. Factual Background

So far as the record reveals, before 1979 IDPA never sought or received FFP for IMD services given to those between 21 and 65. However, in February 1979, relying on its interpretation of 42 C.F.R. § 435.1008(b), IDPA wrote the Regional Commissioner of HHS[3] about this regulation. IDPA specifically asked whether "individuals age 22-65 who enter an institution are eligible during this first month." The record shows that HHS referred this question to its Office of General Counsel for consideration. Sometime in late 1979 or early 1980, HHS's Regional Medicaid Program Representative, Patricia Richter ("Richter") told IDPA that claims for FFP for IMD services to 22-64 year olds during their first partial month in an institution seemed to be in accord with the Act and its regulation. Richter also told IDPA that no state plan amendment was necessary for the State to submit claims for this FFP.
*1425 Illinois began claiming reimbursement in January 1980. Several months later, on September 9, 1980, HHS Regional Administrator finally sent a formal written response to IDPA's queries made eighteen months earlier. In relevant part he wrote:
With respect to the second issue raised  that of individuals between the ages of 21 and 64  FFP is available for medical care and services to an otherwise eligible individual during the first month of institutionalization. Coverage extends to all services specified in the approved State plan including per diem rates.
Letter of George R. Holland, HHS Regional Administrator to IDPA, Administrative Record at 127.
An HHS report which later disallowed IDPA's claims for FFP, dated April 6, 1983, supports the above history that HHS for a time believed that FFP was available for the IMD services in question. This report suggests that HHS shifted its policy in 1982:
C. Guidelines

The Bureau of Program Policy (BPP) issued policy memorandums (date, August 21, 1980 and November 17, and 24, 1980) that indicated FFP was available for both the IMD services and all other non-IMD services covered under the State plan for otherwise eligible individuals 21-64 years of age during the first and last partial months of institutionalization in an IMD.
On April 2, 1982, the Associate Administrator for Policy, based on a legal opinion by the Office of the General Counsel concluding that the proper reading of the regulations was to allow FFP during a partial month of eligibility only for services included in the State plan, issued a policy statement that superseded the previous memorandums on this subject. This memorandum stated that FFP is not available for the inpatient psychiatric care and services (IMD services) provided to individuals aged 21 to 64 during their partial months of institutionalization because such services would not meet the definition of medical assistance and would not be included in the State plan. However, the memorandum stated that, under the regulations, FFP is currently available for all non-IMD services covered under the State law for otherwise eligible individuals during their partial months of institutionalization in an IMF. (As noted above, the regulations now in clearance will preclude FFP for all services).
In summary, the statute provides that no FFP is available for any care or services for individuals aged 21 to 64 from the date of admission to the date of discharge in an IMD. The regulations provide an exception, but only for non-IMD services during the month in which an individual becomes a patient in an IMD. The policy issuances have varied from allowing both IMD and non-IMD services during the partial months of institutionalization to the current issuance which only allows the non-IMD services during this period.
(Emphasis added). This report concludes that the earlier policy interpretations conflicted with the requirements of the statute and regulations, and that the latter control. Relying on this interpretation of the regulation, HHS decided to disallow IDPA's previous FFP claims for IMD services given to individuals aged 21-64. These claims spanned ten quarters, beginning in January 1980, ending in June 1982, and totalling some $4,000,000 in federal reimbursement.
Illinois is not the only state which had claimed FFP for all IMD services during the first partial month of institutionalization, only to have HHS later disallow such claims. The record shows that at least five other States ran into similar problems, and the Board had previously upheld disallowances against these States in its "Decision No. 436," dated May 31, 1983.
IDPA appealed HHS's decision to disallow the IMD claims to the Board. In "Decision No. 517," dated February 29, 1984, the Board upheld the disallowances, relying in large part on its previous decision, No. 436. IDPA sought judicial review in this Court under the Administrative Procedure *1426 Act, 5 U.S.C. § 551 et seq., claiming that the Secretary's disallowance and the Board's affirmance were arbitrary, capricious and not supported by substantial evidence.

3. The Board's Decision

The opinion of the Board in this case thoughtfully considered each of IDPA's arguments at length. It first summarized and reaffirmed its Decision No. 436, which involved similar claims raised by the five other States. In that decision the Board had held, among other things, that:
a. the statutory scheme upholds the Agency's current interpretation of the statute to exclude FFP for the first partial month of admission of IMD patients between the ages of 21-64.
b. the regulatory scheme as a whole supported that interpretation.
c. the documentary evidence submitted by the States failed to support its claim that HHS had a longstanding policy of such FFP.
d. the States had not relied reasonably to their detriment on HHS's communications to warrant invoking the doctrine of equitable estoppel.
The Board in the present case next noted that IDPA had not expressly questioned the analysis in Decision No. 436, but instead relied upon the correspondence between IDPA and HHS which we summarized above. After reviewing this new evidence the Board held that:
a. the evidence did not alter its conclusion that HHS had no longstanding policy that the costs at issue were allowable.
b. the HHS letter of September 9, 1980 was neither a binding policy ruling nor a binding admission.
c. IDPA, like the other States, had not made out a claim of equitable estoppel.
IDPA seeks review of this Board decision. Virtually its whole case hinges on the Board's first finding, that is, whether HHS had the former policy allowing IDPA's claim. This finding in turn rests on Decision No. 436, which first held that HHS had no such policy. IDPA argues vigorously that HHS had this policy, reversed it and is now unlawfully trying to apply its new policy retroactively.

4. The Court's Mission in this Case

In well-written briefs, the parties have thoroughly examined the statutory and regulatory history of the IMD exclusion. The Secretary argues forcefully that the relevant regulation, 42 C.F.R. § 435.1008, can only be read in light of what it terms the clear legislative command forbidding any federal reimbursement for institutional IMD services given to 21-65 year olds. IDPA counters that a narrow exception for the first or last partial month of admission is warranted by legislative history concerning administrative convenience. We think that both readings are superficially plausible. We agree with IDPA that our initial focus should not be on the best reading of the statute, but on whether the Secretary has formally reversed her reading of the statute and applied its new reading retroactively on IDPA. If IDPA is correct that the Secretary has pulled an official flip-flop, we then must interpret the statute and determine if her former position violated the statute. But if the Secretary has not flipped, then we may avoid the difficult question of who is right in reading the statute, as IDPA concedes, the Secretary's current interpretation of the statute and regulation is lawful as applied prospectively.
The parties' analysis of whether the Secretary in fact had and then reversed what Illinois calls a "long-standing policy" of FFP for partial month IMD services is a bit askew. Both sides focus on the issue and record as if this were a de novo proceeding. Such is not the case. The Board found in Decision No. 436, and reaffirmed in Decision No. 517, that the Secretary had no such longstanding policy. We are constrained in this administrative review to affirm the Board's finding if it is supported by substantial evidence in the record as a whole and if it is not arbitrary, capricious *1427 or otherwise unlawful. 5 U.S.C. § 706(2)(A), (E). Whether the Secretary actually had the alleged policy is a difficult question. The record is not entirely clear on this point, and the Board considered the record in depth. But despite our narrow scope of review, we think that the record as a whole cannot support the Board's conclusion that no formal official policy existed.

6. IDPA's Evidence and the Board's Treatment of It

Before discussing the specific evidence, we note some background facts from the record. The regulation at issue here was first promulgated in 1971. Yet it was not until 1979 that IDPA asked the Secretary about clarifying the scope of the regulation's exception. The Secretary responded that she[4] was referring the question to the Office of General Counsel. The formal response to the inquiry did not come until September 1980, nine months after IDPA began claiming reimbursement. From these facts, it is difficult to say, as IDPA does, that the Secretary's policy was longstanding. Nor can it be said that the policy was crystal clear to everyone at that time. But we conclude it nevertheless existed.
Against this backdrop we turn to IDPA's most damning pieces of evidence: the April 1982 disallowance memorandum quoted above and several HHS internal memoranda from 1980. The April 1982 memorandum relies on the earlier ones and quite obviously suggests that a formal policy reversal had taken place. The earlier policy memoranda contain seemingly consistent statements of policy. The August 21, 1980 memorandum is representative. Directed to Regional Medicaid Directors from the "Director, Bureau of Program Policy," it states in relevant part:
This responds to various regional inquiries regarding the availability of FFP for services to individuals in institutions for tuberculosis or mental diseases during the month in which an individual enters an institution for tuberculosis or mental diseases.
* * * * * *
A State may cover medical care, including psychiatric care and services, as indicated in the State plan, during the month in which an individual enters an institution for tuberculosis or mental diseases when three conditions exist:
* * * * * *
Section 1905(a)(17)(B) of the Act precludes Federal matching of any payments for medical care given to patients in an institution for tuberculosis or mental diseases who are in the 21 through 64 years of age group. As an exception to this provision, based on administrative convenience, FFP is available for medical care and services to an otherwise eligible individual, regardless of age, as indicated in the State plan during the first month of institutionalization (Senate Report No. 400, Part 1, 89th Cong., 1st Session (1965) at 82).
We are in the process of reexamining this area and will notify you if our development results in a policy revision.
Similarly, a December 8, 1980 memorandum to Regional Administrator states:
This responds to your inquiry of October 24 for clarification of Median policy on the month of admission for individuals in the 21 through 64 years of age group who reside in an IMD/TB. Your request indicates that, based on Sections 1905(a)(14) and (16) and the corresponding regulations at 42 CFR 440.140 and 440.160, Federal Financial Participation (FFP) is limited to inpatient hospital services for individuals 65 years of age or over in an IMD/TB, or to inpatient psychiatric hospital services for individual under age 21.
We concur with your interpretation of policy for those particular groups. However, as indicated in our previous memorandum *1428 of August 21, FFP is available for medical care, including psychiatric care and services provided to an individual in the 21 through 64 years of age group, during the month in which an individual enters an IMD/TB (Senate Report No. 404, Part I, 89th Congress, 1st Session (1965) at 82; Regulation at 42 CFR 435.1008(b)). The inpatient per diem services are covered under the Medicaid program during that partial month in the same manner as the inpatient per diem services are covered in an IMD/TB for the 65 years of age or over group. The States should be informed that FFP may be claimed for those services without the risk of disallowance.
A letter dated December 12, 1980, from a Regional Administrator to a New York State administrator echoes the above statement, as well as the ones made in the September 9, 1980 letter to IDPA:
The current Federal interpretation is that these Medicaid eligible individuals continue to be eligible for medical care, including psychiatric care and services with Federal financial participation during the remainder of the month in which the individual enters an institution for mental disease which meets Title XIX requirements for participation. Based on administrative convenience, our policy for the month of discharge from an institution for mental disease is that Federal financial participation is available for medical care and services to an otherwise eligible individual back to the beginning of that month.
Several other memoranda are consistent.
Other memoranda suggest that there was dissent over this policy within the Agency. A memorandum dated January 1981 from a Regional Director to the Director of the Bureau of Program Operations complains that the rationale of "administrative convenience" could not overcome the general statutory IMD exclusion. The Director of Bureau of Program Policy replied in April 1981 that "[W]e do not agree with your contention that medical care for the [21 to 64 year old] age group in an IMD/TB is a noncovered service." A June 29, 1981 memorandum from the Acting Assistant General Counsel opines that a June 15, 1979 memorandum on the subject (similar to the one above) is "seriously misleading." It reasons that an individual should not get services he would not otherwise get simply by being institutionalized for part of a month. The Agency finally and clearly adopted this latter position in April 1982, as the memorandum disallowing IDPA's claim shows.
Despite this seemingly powerful evidence that HHS had and then reversed the policy IDPA says it had, the Board in Decision No. 436 concluded that HHS in fact had no firm policy. First, the Board exhaustively analyzed the statute and the underlying regulations, concluding that the Agency's current policy was most in accord with these provisions. It then analyzed, among other things, the above documentary evidence. It just concluded that no formal policy issuances ever spelled out the alleged former policy. IDPA does not point us to any such issuances, so we assume this to be correct. The policy, to the extent it ever existed, could be found in the HHS internal memoranda which we have detailed above. The Board accurately summarized these memoranda, conceded that they "seem to suggest the allowability of the claims involved here," but concluded that "these memoranda were not intended as an official interpretation of the statute."[5]
*1429 We think the Board's reading of the documentation is strained and unsupported by the plain and repeated language of the documents themselves. Although policy was in a state of flux, and there was dissent and some confusion, we think that the documents compel a conclusion that HHS did for a time have an official policy to allow FFP for all IMD services for the first partial month of admission. The Secretary now concedes in her brief that at least some within the Agency held this view, but argues that the Agency as a whole was confused and settled policy never emerged. The dissent and confusion does not contradict the fact that the policy was settled for awhile. The only dissent that we see came from a lower authority, a Regional Administrator, and that dissent was rebuffed by the Central Office. And this dissent occurred after issuance of the crucial August 21, 1980 memorandum, indicating that the disagreement was about current Agency policy. The Board recognized this, but lamely reasoned that the States were not told they had no risk of disallowance. This might have born on an estoppel issue, but not on whether the Agency actually had the policy in question.
The April 1982 memorandum underscores the fact that the policy actually existed. It unmistakably indicates that IDPA's claim would have once been viable, but that on April 2, 1982, the Agency felt that the earlier memoranda had misread the statute and regulations: This clearly signals a reversal. Something was reversed, and that "thing" was the policy of partial month FFP for IMD services. Memoranda from the Office of General Counsel reinforce the conclusion that the policy existed. First, a memorandum by Attorney Nancy King clearly refers to the August 21, 1980 memorandum as if it were current agency policy. It addresses the problem of states relying on the policy to obtain FFP retroactive to 1971. Second, the June 29, 1981 memorandum of the Acting Assistant General Counsel attacks the statutory validity of the policy. Both of these memoranda speak as if the policy actually existed.
The above documentation as a whole suggests that something close to this scenario occurred: For several years until 1978 or 1979 nobody seemed to notice that the regulation, 42 C.F.R. § 435.1008(b), could be read to allow the type of FFP that IDPA is claiming. States began asking about it, and a period of some flux ensued as HHS tried to answer the States' questions. The series of memoranda beginning August 21, 1980 indicate that for a time the agency did firmly adopt the policy in question. There were no formal policy issuances to that effect, but the record shows clearly and unmistakably, we believe, that high-ranking policymakers within the agency had adopted the policy. Some within the agency dissented, including legal counsel beginning in 1981, arguing that the policy violated the Social Security Act. The dissenters ultimately prevailed in 1982, as HHS reversed its policy.
Given this factual scenario, we must now reach the question whether the Secretary can lawfully apply its new policy retroactively in order to disallow IDPA's claims. This determination will hinge on whether the former policy was valid under Title XIX.

6. Statutory Authority for the Old Policy

We believe the Secretary is correct that her former, short-lived policy violated the Social Security Act. The parties do not dispute that the Act in clear terms forbids FFP for services to 21-65 year old patients "in an institution for tuberculosis or mental disease." See 42 U.S.C. § 1396d. This exclusion reflects the Congressional intent that such services be left to the states, which had traditionally been responsible for them. See S.Rep. No. 404, 89th Cong., 1st Sess. 144, reprinted in 1965 U.S.Code Cong. & Ad.News 1943, 2084. IDPA points to no explicit statutory exception to this general exclusion. It is axiomatic that the Secretary cannot enlarge the scope of the Act by herself. Without express or implied delegation of authority, then, she lacks power to create an exception to the *1430 general IMD exclusion. 42 C.F.R. § 435.1008(b) can be read as just such an exception, and we held above that her former policy read that regulation as an exception. The question for the Court is whether this exception was somehow consistent with implied Congressional intent or whether it impermissibly expanded the scope of the statute.
IDPA's position rests on the regulation and policy allowing states, for purposes of administrative convenience, "to make eligibility for Medicaid effective on the first day of a month if an individual was eligible any time during that month." 42 C.F.R. § 435.914(b) (1981). It reasoned that 42 C.F.R. § 435.1008(b) was promulgated to effectuate that policy of convenience by allowing FFP for the first month of all institutional services so long as an individual was eligible before entering the institution. The purported congressional authority for this policy comes not from the statute, but from a Senate Report written when Medicaid was passed in 1965:
Medical assistance provided under the bill may include payment for care and services provided at any time within the month in which an individual becomes eligible or ineligible for assistance, e.g., by attaining a specified age. This avoids the administrative inconvenience of having to segregate bills by the day of the month on which care or services were provided and is consistent with the monthly pattern of benefits under the other public assistance titles.
S.Rep. No. 404, Part I, 89th Congress, 1st Session 82 (1965), reprinted in 1965 U.S. Code Cong. & Ad.News 1943, 2022. We do not think this Senate Report supplies the congressional intent necessary to support the Secretary's former policy or IDPA's current position.
The above quotation speaks to convenience in the context of whether "an individual becomes eligible or ineligible for assistance." However, we agree with the Secretary that the statutory IMD exclusion speaks not to the eligibility of an individual, but rather to the eligibility for FFP for a type of service. The structure of the Act supports this reading. The general IMD exclusion appears in the section defining the range of eligible services, under the heading "medical assistance," not under the section defining the categorical and financial eligibility of individuals. The exclusion appears several times in the statute parenthetically as an exception to the type of service for which the states can claim reimbursement. And the passage from the Senate Report does not by its terms allow exceptions to the term "medical assistance," which expressly excludes IMD services to 21 to 65 year olds. Rather it allows individual eligibility for medical assistance to be decided on a monthly rather than daily or weekly basis. Nowhere does the statute or the report allow "medical assistance" to include the services in question.
IDPA's reading and the Secretary's former policy are internally incoherent because their rationale of administrative convenience does not in fact support their views. Drawing upon the policy of administrative convenience, IDPA argues that "[a]s long as a person is eligible at any point within the month, then medical assistance is available for the entire month." Plaintiff's Response to Defendant's Memorandum in Support of Motion For Summary Judgment at 5 (emphasis added). This argument silently assumes that "medical assistance," which is a term defined specifically by statute, can ever include the IMD services in question. We held above that it could not. Moreover, we do not see how IDPA's reading materially furthers administrative convenience in the manner contemplated by the Senate Report. That report allows monthly reporting to avoid "the administrative convenience of having to segregate bills by the day of the month on which care or services were provided." (Emphasis added). This language does not expand the range of available services under the Act, but instead, for convenience sake allows an individual's eligibility to be determined monthly. The convenience mentioned refers to the situation where an individual becomes eligible or ineligible *1431 during a month because of, for example, change in income, resources or age. But this policy of convenience does not spare the states the administrative inconvenience of segregating bills by the type of service. Indeed, the statute's complex definition of "medical assistance," with all of its limitations on the range of services included, shows that states must always segregate bills by the type of service rendered.
Even when Congress did define "medical assistance" to include some IMD services  for those 65 or older or younger than 21  it did so with several conditions which show that it was concerned with the type of service provided, not just the age of the individual. For example, among other requirements, a state plan for medical assistance which includes IMD services for individuals 65 years of age and older must require the formulation of individual patient care plans and the development of alternate methods of care. 42 U.S.C. § 1396a(a)(20). Similarly, in authorizing inpatient psychiatric hospital services for individuals 21 years of age and younger, Congress limited such services to those provided in a psychiatric hospital accredited by the Joint Commission on Accreditation of Hospitals. And Congress insisted that such inpatient psychiatric hospital services meet other statutory and regulatory requirements. 42 U.S.C. § 1396d(h). Accordingly, the statutory exclusion of IMD services is not solely related to the eligibility of the individual but also involves the category of IMD services itself. IDPA's interpretation is thus unreasonable: If persons between 21 and 65 were entitled to IMD services during their month of admission, they would enjoy more services than those available to persons above 65 or below 21. For instance, they would not be subject to the restrictions which 42 U.S.C. § 1396d(h) places on patients below 21 nor to the requirements 42 U.S.C. § 1396a(a)(10) places on services given to patients above 21. Thus, IDPA's reading runs afoul of not only the general IMD exclusion, but also the Congressional limitations placed on IMD services when those services are authorized.
In sum, we conclude that the Senate Report does not support the Secretary's former position or IDPA's current reading. IDPA points to no other source of Congressional intent bolstering its interpretation. Instead, it argues strenuously that the plain meaning of the Secretary's regulations supports its position. Even if this were so, the regulation could not overcome what we hold to be a statutory bar without exception. We therefore hold that IDPA's claimed reimbursement, and the former policy upon which it is based, had no basis in Title XIX of the Social Security Act.
That being so, IDPA's arguments concerning retroactivity lose their force. From IDPA's perspective, the Secretary had a lawful policy under which IDPA submitted its claim, but she reversed her policy and is trying to recoup the money she already paid out under the old lawful policy. See Daughters of Miriam Center for the Aged v. Mathews, 590 F.2d 1250 (3d Cir.1978). This argument has some appeal, but it rests on the flawed assumption that the Secretary's former and current policies were both lawful. Were the Secretary acting within her broad discretion to change from one lawful policy to another, we might be inclined to agree with IDPA that her reversal and subsequent retroactive application of the new policy was unfair and arbitrary. But we have held that the Secretary's former short-lived policy was itself contrary to the statute and thus outside the scope of her discretion. And IDPA has cited no authority which would forbid recoupment of funds paid out unlawfully under the Act.[6]
*1432 Because the Secretary's former policy was unlawful, IDPA's redress, if any, could conceivably lie under a theory of estoppel. The communications between HHS and IDPA raise a plausible question that an estoppel was created. The Board considered and rejected the estoppel theory. Although IDPA alleged a theory of estoppel in its complaint, it scuttled this theory in its briefs on summary judgment, choosing to throw all of its eggs into one basketthe retroactivity issue. In light of this withdrawal, we need not review the Board's rejection of the estoppel theory.

Conclusion
We affirm the result of the Board disallowing IDPA's claim for the FFP in question. Although its conclusions about the existence of the Secretary's former policy appear to us to be in error, it correctly ruled that that policy was inconsistent with Title XIX considered as a whole. We therefore grant the Secretary's motion for summary judgment and deny Illinois' cross-motion. It is so ordered.
NOTES
[1] States are not required to participate in the Medicaid program. If they chose to do so, the plan they submit to the Secretary of HHS must fulfill the requirements of Title XIX. See Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). The plan describes the nature and scope of the state program and provides assurances to the Secretary of HHS that the State will administer the program in conformity with the requirements of the federal guidelines. 42 U.S.C. § 1396a(b); 45 C.F.R. § 201.20.
[2] The State, of course, can volunteer to furnish medical assistance to these individuals. If, however, it furnishes assistance to individuals aged 22 to 65 in institutions for mental diseases, the State does so without federal reimbursement. Harris v. McRae, 448 U.S. 297, 311, 100 S.Ct. 2671, 2685, 65 L.Ed.2d 784 (1981).
[3] Of course, in 1979 the Department was called "Health, Education and Welfare" or HEW. For simplicity, we have used the new name, HHS, throughout this opinion.
[4] Although at some times during this case the Secretary was a "he," we have used her current gender throughout this opinion.
[5] It stated several reasons. First, as internal agency documents they were never issued to the States in the usual manner for authoritative statements of policy. Second, the August 21, 1980 memorandum, as well as several of the others qualified the interpretation to services "as indicated in the State Plan." None of the States in No. 436, as well as IDPA in this case, had such services listed in their state plans. Third, the dissent mentioned above suggests a context in which the question was unsettled. Although central office indicated that the states should be advised that they ran no risk of disallowance, they were never so advised. Fourth, as a matter of policy, the Board felt it would inhibit future internal agency dialogue if internal agency documents could be relied upon by the States.
[6] In Daughters of Miriam, the case IDPA relies heavily upon, the Secretary had had a policy allowing nursing homes to depreciate assets on an accelerated basis. She then reversed the policy in favor of a straight-line method of depreciation and tried to apply her new policy retroactively. The Court held that the retroactive application of the policy was unlawful. The major difference between that case and this one is that both policies in Daughters of Miriam were lawful and within the scope of the Secretary's discretion.

But even if the retroactivity analysis in that case were relevant, as IDPA claims it is, we are not so sure that analysis favors IDPA's case. As IDPA recognizes, retroactivity is not per se unlawful. See E.L. Wiegand Division v. NLRB, 650 F.2d 463, 471 (3d Cir.1981), cert. denied, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); see generally 4 K. Davis, Administrative Law Treatise §§ 20:5, 20:7, 20:8 (2d Edition 1983). Rather, courts must balance the public interest favoring retroactive application of a rule against the interests disrupted by retroactivity. See Daughters of Miriam, 590 F.2d at 1260 & n. 27. The balance here appears to favor the Secretary. Because she recognized that her former policy violated the Medicare Act, her decision to apply the new policy retroactively, is entitled to great weight:
[R]etroactive rules designed to cure defects in regulatory schemes, such as the Medicare program, are often sustained because the interest in the retroactive curing of such a defect in the administration of government outweighs the individual's interest in benefitting from the defect.
Id. (Quotation omitted). Here the public interest strongly favors a policy which squares with the Act. On the other side of the ledger, Illinois stands to lose what it has gained from the incorrect interpretation of the Act. But it would have spent the funds in question regardless of what the Secretary did. True, reimbursement would open up other funds for use by the state, but this benefit does not outweight the harm caused by letting the faulty reading of the Act go uncorrected. See E.L. Weigand, 650 F.2d at 471 (significant statutory interests may "counterbalance" any inequities of retroactive applications).